SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
CHRISTINE ROBINSON, as Administratrix of
The Estate of CHARLES ROBINSON (Deceased)      Index No. 102456/95
and CHRISTINE ROBINSON

AFFIDAVIT

                          Plaintiffs,

   - against -

METRO-NORTH COMMUTER RAILROAD, THOMAS
CLARK, MARK STESSNER, ALAIN STURGIS, and
JOHN HERRLIN, jointly and severally

                          Defendants.
-------------------------------------------------------------X

CAMPBELL HOLDER, deposes and says that:

    1.    I, represent Plaintiffs in the above-captioned matter and I am fully familiar with the facts and circumstances in this action. Plaintiffs submit this affidavit, the annexed documentary evidence and memorandum of law in opposition to Defendant Metro-North Commuter Railroad ("Defendant") motion for summary judgment and dismissal of the instant action.

**Procedural History**

    2.    On or about February 1, 1995 Charles Robinson ("Plaintiff") served all Defendants, named in the above-captioned action, with a Verified Summons and Complaint asserting claims for physical and emotional injuries he sustained by their negligent supervision and implementation of Metro-North Commuter Railroad ("Defendant") drug-abuse treatment program.

    3.    On March 14, 1997 Defendants moved for an order pursuant to CPLR 3215(c) and for an order dismissing Plaintiffs' claims on the grounds that they

were not meritorious, were preempted by the Railway Labor Act and could not be maintained under the Federal Employees Liability Act. (See Exhibit 2, pp. 4 – 8) Plaintiffs opposed the motion and cross-moved for an order for (i) granting him a default judgment or in the alternative (ii) for an order substituting as Plaintiff, Christine Robinson, as Administratrix of the Estate of Charles Robinson since Charles Robinson died on February 12, 2000.

4. The court denied Defendant's motion in its entirety and granted Plaintiff's motion to the extent that it permitted the complaint to be amended by substituting the name of Christine Robinson as Administratrix of the Estate of Charles Robinson, deceased, as Plaintiff in the place and stead of Plaintiff, Charles Robinson. The complaint was also amended to include a wrongful death action. (See Exhibit 1)

5. Defendant now moves for an order dismissing the amended complaint on the grounds that (1) Plaintiffs' claims are preempted by the Railway Labor Act ("RLA") and (2) Plaintiffs' action cannot be maintained under the Federal Employees Liability Act ("FELA"). Defendant's motion must be denied in that these issues have already been judicially determined and settled by a judgment rendered in this action and, therefore, Defendant is collaterally estopped from relitigating these issues. (See Exhibit 1) In addition, as shown in Plaintiffs' Memorandum of Law submitted herein, this court has subject matter jurisdiction over Plaintiffs' claims and material and triable issues of fact exist.

Relevant Facts

6. Plaintiff Charles Robinson ("Plaintiff") was employed with Defendant from 1976 – 1993. For twelve of the seventeen years Plaintiff was employed as a

to return to work. Thereafter, Dr. John Herrlin, medical examiner for Defendant performed several fitness-for-duty medical examinations of Plaintiff. Each examination required Plaintiff to submit a urine sample for testing. Plaintiff's urine tests as administered by Dr. Herrlin were all negative except for his October 2, 1992 test. After examining Plaintiff on October 2, 1992 Dr. Herrlin pronounced him ready to return to work. (See Exhibit J attached to NLG Aff'd. of Def's. Mot.)[1] On October 4, 1992, which was on Sunday, Plaintiff's crew dispatcher, Jimmy Keiller, called him at home and told him he could not return to work because the last test showed that his "urine was bad". (See Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.) Mr. Keiller told Plaintiff that he obtained that information about his urine from a note left on his desk and that he did not know who put the note on his desk. (See Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.) According to company policy the results were supposed to be confidential and to be communicated to the employee discreetly by Prevention Committee members or other employees whose job entailed such communications and not the crew dispatcher, Mr. Keiller. (See Exhibit 6, Clark Depo. p. 12 lines 8 - 21; Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.)

7. Plaintiff was not taking drugs and knew that the test result of his October 2, 1992 urine sample showing that he had ingested illegal drugs was a mistake. Plaintiff contacted his union representative, Ronald Folmsbee, who requested that Plaintiff's urine sample showing a positive reading be sent to Roche Laboratory, an independent reference

---

[1] The Affidavit of Nancy Ledy-Gurren submitted in connection with Defendant's instant motion is hereinafter referred to as NLG Aff'd.

3

laboratory, for retesting. (See Exhibit 9, p. 10; Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.)

8. On or about October 8, 1992 Roche Laboratories notified Plaintiff's union representative that it could not test Plaintiff's urine sample because the seal on his sample container it received was broken. Defendant then informed Plaintiff's union representative that it would not accept any test results on Plaintiff's urine sample that was taken after the urine sample which was positive for illegal drugs. (See Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.) Plaintiff told Defendant's employees, Thomas Clark and Alan Sturgis, that the test showing he had ingested illegal drugs was wrong and asked for another test and/or for some further investigation of the matter. His requests were ignored and in essence denied. (See Exhibit 6, Clark Depo. p. 17 lines 17 - 24, p. 22 lines 12 - 25; Exhibit 5, Sturgis Depo. p. 11 lines 13 - 22; Exhibit O, p. 850, 10/16/92 note, attached to NLG Aff'd. of Def's. Mot.; Exhibit F, p. 5 para. 2 attached to NLG Aff'd. of Def's. Mot.)

9. As a result of the October 2, 1992 inaccurate test results and Defendant's denial of Plaintiff's requests for re-testing of the October 2, 1992 urine sample by an independent laboratory, as well as the testing of another urine sample, Plaintiff was faced with only two options: enrollment in Defendant's Employee Assistance Program ("EAP") which involved participation in a drug-abuse treatment program, or endure disciplinary proceedings which, more than likely, would result in the termination of his employment of 16 years with Defendant. (See Exhibit 6, Clark Depo. p. 18 lines 4 - 10, Exhibit 5, Sturgis Depo. p. 9 lines 5 - 14)

by the fear and threat of losing his job by exercising his option for a disciplinary hearing. Plaintiff consulted with Alan Sturgis, an EAP Counselor on October 16, 1992. (See Exhibit 5, Sturgis Depo. p. 8 lines 18 - 20) Plaintiff's consultations with Mr. Sturgis confirmed that if he were to opt for a disciplinary hearing, at the conclusion of that hearing, it is likely that he would lose his job which he held with Defendant for more than 16 years. (See Exhibit F, p. 5 attached to NLG Aff'd. of Def's. Mot.) In order to participate in Defendant's EAP, Defendant required Plaintiff to sign a waiver, waiving his right to a disciplinary hearing in connection with the false positive readings of his urine sample. (See Exhibit 5, Sturgis Depo. p. 9 lines 10 - 14)

11. When Plaintiff had his initial consultation with Mr. Sturgis on October 16, 1992 he had not signed the waiver which would have allowed him to receive drug abuse treatment under Defendant's EAP. (See Exhibit O, p. 850, 10/22/92 note attached to NLG Aff'd. of Def's. Mot.) Defendant's EAP counselor Alan Sturgis told Plaintiff that he must sign the waiver before he can evaluate him and before he can participate in Defendant's EAP. (See Exhibit 5, Sturgis Depo. p. 9 lines 23 to p. 10 line 13) On October 21, 1992, Plaintiff signed the waiver and began outpatient treatment for the alleged drug abuse. (See Exhibit N, attached to NLG Aff'd. of Def's. Mot.) Plaintiff was then treated by Mr. Sturgis until October 30, 1992 when he referred him to the Washton Institute ("Washton"), an outpatient alcohol and drug treatment program. (See Exhibit 5, Sturgis Depo. p. 12 lines 18 – 22; Exhibit O, p. 850 attached to NLG Aff'd. of Def's. Mot.)

12. On October 30, 1992 Plaintiff became an outpatient in the Washton drug treatment program and cooperated fully with its requirements, attending 90-minute

counseling with Washton per week, submitting urine samples at least twice a week from October 30, 1992 to February 17, 1993. (See Exhibits 7, 8 & 9; Exhibit 5, Sturgis Depo. p. 13 line 4 to p. 14 line 6; Exhibit O, pp. 848 – 849 attached to NLG Aff'd. of Def's. Mot.) In several reports during the period November 9, 1992 - February 3, 1993, Washton rated Plaintiff's progress as "good" where the ratings were categorized as "poor", "fair", "good", and "excellent". (See Exhibit 9)

        13.    On or about February 9, 1993 Washton told Plaintiff that his February 8, 1993 urine sample indicated the presence of illegal substances. Upon receiving this information Plaintiff and Dr. Needles, Plaintiff's physician, requested that Washton allow a re-test of the February 8, 1993 urine sample by an independent laboratory because Plaintiff did not ingest illegal drugs, therefore, the test result had shown a false positive reading. (See Exhibit 10; Exhibit O, pp. 846 - 848 attached to NLG Aff'd. of Def's. Mot.) Three days later, Washton agreed to the re-test but the sample was not sent to the independent laboratory for eight or nine days after Washton's approval, and, therefore, Plaintiff's urine sample arrived on February 26, 1993 at Roche Laboratory. (See Exhibit F, p. 6 attached to NLG Aff'd. of Def's. Mot.; Exhibit 11 - letter dated 2/23/93 from Easton Laboratories to Roche Biomedical Laboratories) The March 3, 1993 Roche Laboratory re-test of Plaintiff's February 8, 1992 urine sample proved negative for cocaine and any other illegal drugs. (See Exhibits 11 and 14)

        14.    In the meantime, Defendant's EAP counselors, Mr. Sturgis and his supervisor, Thomas Clark, told Plaintiff that because his February 8, 1993 urine sample tested positive for cocaine he must attend an in-patient drug-abuse treatment program. (See Exhibit O, pp. 847 - 848, 851 attached to NLG Aff'd. of Def's. Mot.; Exhibit 6,

Clark Depo. p. 15 line 13 to p. 16 line 12; and Exhibit 5, Sturgis Depo. p. 17 lines 3 - 22) Plaintiff told Mr. Sturgis and Mr. Clark that he had not taken illegal drugs and he asked that the decision regarding his attending an in-patient program to be delayed until Defendant received from Roche Laboratory the results of the re-test of his February 8, 1993 urine sample. (See Exhibit O, p. 847 attached to NLG Aff'd. of Def's. Mot.; Exhibit 5, Sturgis Depo. p. 17 line 23 to p. 18 line 3; Exhibit F, p. 5 para. 2 attached to NLG Aff'd. of Def's. Mot.) On February 26, 1993 Dr. Needles wrote to Mr. Sturgis also requesting that Plaintiff's participation in Defendant's EAP in-patient drug abuse treatment program be delayed until Defendant received the result of the re-test, by an independent reference laboratory, of Plaintiff's February 8, 1993 urine sample. (See Exhibit 10; Exhibit O, p. 847, 2/26/93 note, and p. 834 attached to NLG Aff'd. of Def's. Mot.)

15. These requests were denied and Mr. Sturgis and Mr. Clark told Plaintiff that if he did not become an in-patient in Defendant's EAP drug rehabilitation program, Defendant would commence disciplinary proceedings against him, which more than likely would result in the termination of his 16-year employment with Defendant. (See Exhibit 5, Sturgis Depo. p. 17 lines 11 - 15; Exhibit O, p. 847, 2/24/93 note, & p. 851 attached to NFG Aff'd. of Def's. Mot.) Under the fear and threat of losing his job with Defendant Metro-North, Plaintiff became a patient of Gracie Square Hospital ("Gracie Square") on March 1, 1993 to be treated for the alleged drug abuse. (See Exhibits 12, 13; Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.) Plaintiff had no role in Defendant's EAP employees' decision to confine him to Gracie Square, a psychiatric hospital, neither did Plaintiff have a role in the selection of the institution in which

Defendant wanted to confine him as a patient for drug abuse treatment. (See Exhibit O, pp. 846 - 848 attached to NLG Aff'd. of Def's. Mot.; Exhibit 5, Sturgis Depo. p. 17, lines 7 – 22 and Exhibit 6, Clark Depo. p. 17 lines 15 - 18)

16. Before Plaintiff became a patient in Gracie Square, the EAP counselors had assured him that if the re-test of his February 8, 1993 urine sample showed a negative result he would be released from Gracie Square. (See Exhibit O, pp. 847 - 851 attached to NLG Aff'd. of Def's. Mot.; Exhibit F, p. 6 attached to NLG Aff'd. of Def's. Mot.) On March 5, 1993, Dr. Needles wrote to Mr. Clark informing him that the re-test of Plaintiff's February 8, 1993 urine sample proved negative for illegal substances, therefore, Plaintiff should be released from Gracie Square. (See Exhibits 11 and 14) Unfortunately, Mr. Clark did not keep his word and Defendant's EAP employees were rather adamant in their instructions to Gracie Square not to release Plaintiff even though they had obtained reliable evidence that Plaintiff's February 8, 1993 urine sample was not positive for illegal drugs. (See Exhibit 15 p. 2 para. 3; Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.)

17. Plaintiff was then forced to remain in Gracie Square until March 29, 1993, an additional 24 days after Defendant's EAP employees became aware that the test result which led to their decision to confine him to a psychiatric institution was incorrect. (See Exhibits 11, 12; Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.; Exhibit 6, Clark Depo. p. 24 lines 15 to 20; Exhibit 5, Sturgis Depo. p. 18 lines 4 - 17)

18. Not only did Defendant's EAP employees ignore the negative result of the re-test of Plaintiff's February 8, 1993 urine sample, but they informed Plaintiff that if he left Gracie Square without being discharged, disciplinary proceedings would be

Exhibit 6, Clark Depo. p. 17 line 25 to p. 18 line 8) Defendant then hired an independent psychoanalyst to examine Plaintiff in the hopes of finding some justification for its decision to confine Plaintiff in Gracie Square based on questionable test results that he had abused illegal drugs. (See Exhibit 15, p. 2, para. 2 and Exhibit 16)

19. Even though Plaintiff began to suffer from weakness, dizziness, shortness of breath and fatigue, during his forced in-patient treatment at Gracie Square, Plaintiff cooperated fully with all the demands made of him in connection with the treatment for his alleged drug abuse for which Defendant had no evidence. (See Exhibits **11, 14, 15 and 16**) Upon his admission to Gracie Square, Plaintiff was given various blood and urine tests. On his third day of confinement at Gracie Square, Plaintiff was diagnosed as having an abnormal blood count. (See **Exhibit 15, p. 2 para. 2; Exhibits 17 & 19**) During his outpatient treatment at Washton, Defendant's December 4, 1992 medical examination of Plaintiff indicated that on October 2, 1992 Plaintiff was suffering from anemia and this condition had worsened. (See **Exhibit P, attached to NLG Aff'd. of Def's. Mot.**) On numerous occasions Plaintiff complained to the employees at Gracie Square about his symptoms but they ignored him and he received no treatment for these symptoms, nor was he allowed to leave to obtain medical attention for his life-threatening illness. In addition, Defendant's employees and agents did not tell Plaintiff that his condition was serious and that he needed immediate medical attention. (See Exhibits 15 and 17)

20. The records show that although Defendant became aware that the test result upon which they mandated that Plaintiff be confined to a psychiatric facility

showed a false positive, Defendant continued to deprive Plaintiff of his liberty which caused him physical pain and suffering because he could not seek medical attention for his life-threatening blood disease. Plaintiff's physical condition and illness worsened during his confinement at Gracie Square and caused him to collapse and be hospitalized immediately after Defendant released him from his confinement at Gracie Square. **(See Exhibits 12, 18 and 19)**

21. Also, while Plaintiff was at Gracie Square, he was in constant and daily fear of being injured by the other patients who were drug addicts suffering from the pain of withdrawal, many of whom repeatedly threatened Plaintiff with physical violence. The stress created by this situation also aggravated Plaintiff's illness and caused him additional physical pain and suffering. **(See Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.; Exhibits 17, 18 and 19)** The continued insistence by Defendant's EAP employees that Plaintiff was a drug addict who had to be forcibly treated for drug abuse also contributed to Plaintiff's physical injuries since he felt as if he was in a waking nightmare, in a strange world in which he could not control or predict what would happen to him. **(See Exhibit 6, Clark Depo. p. 22 line 20 to p. 24 line 20 and Exhibit 16, p. 2 para. 1)**

22. Upon his discharge from Gracie Square, Plaintiff immediately met with EAP counselor Mr. Sturgis on March 30, 1993. During his March 30, 1993 consultation with Mr. Sturgis, Plaintiff continued to deny that he had taken illegal drugs and therefore his one-month confinement in a psychiatric facility for alleged drug abuse was unfair since Defendant's EAP employees were aware that the re-test of his urine sample was negative for use of illegal drugs. **(See Exhibit 5, Sturgis Depo. p. 27 lines 18 – 20;**

Exhibit 6, Clark Depo. p. 25 to p. 26 line 8; Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.) Mr. Sturgis' response to the reliable evidence he had received that Plaintiff had not abused illegal drugs was that Plaintiff had to continue to receive treatment for drug and alcohol abuse as an outpatient at Gracie Square and that he was required to report to Gracie Square for treatment four times a week in addition to attending Alcoholic Anonymous ("AA") meetings four times per week and weekly meetings with EAP counselors. (See Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.; Exhibit 5, Sturgis Depo. p. 25 line 16 to p. 27 line 2)

23. Despite Defendant's EAP employees awareness that the re-test of Plaintiff's urine sample showed a false positive reading, Defendant's EAP employees were persistent that Plaintiff's denial of illegal drug use was non-responsive to the drug-abuse treatment he was receiving. (See Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.; Exhibit 6, Clark Depo. p. 22 line 20 to p. 24 line 20) On or about April 3, 1993, Plaintiff and a union representative, Jimmy Phelan, met with Mr. Clark. Mr. Clark told Plaintiff that he did not want to hear again about the negative result of the retest of the urine sample which caused him to confine him to Gracie Square for drug-abuse treatment. (See Exhibit 6, Clark Depo. p. 27 lines 2 - 21)

24. Upon his release from Gracie Square Defendant's EAP counselors mandated that Plaintiff enroll as an outpatient for drug abuse treatment. The treatment required Plaintiff to attend (1) outpatient treatment at Gracie Square four times per week, (2) AA meetings four times per week and (3) to met with Mr. Sturgis or Mr. Clark once a week. (See Exhibit O, pp. 837 - 846 attached to NLG Aff'd. of Def's. Mot. and Exhibit 5, Sturgis Depo. p. 25 line 16 to p. 27 line 6; Exhibit 6, Clark Depo. p. 30

lines 8 - 20) These counseling sessions and AA meetings were in addition to resuming his full-time position as a conductor with Defendant. (See Exhibit O, p. 894 attached to NLG Aff'd. of Def's. Mot.; Exhibit 5, Sturgis Depo. p. 26 lines 4 - 8) Plaintiff did not miss any counseling and treatment sessions or AA meetings unless he had a proper excuse, such as his repeated hospitalizations for his blood disease, which hospitalizations began on April 4, 1993, and his visits to his elderly mother who was seriously ill and being cared for in a nursing home in South Carolina. (See Exhibits 18, 20 and Exhibit F, pp. 2 - 4 attached to NLG Aff'd. of Def's. Mot.; Exhibit O, pp. 840 – 845 attached to NLG Aff'd. of Def's. Mot.)

25.  On April 4, 1993 while visiting his sick and aged mother in South Carolina, Plaintiff collapsed and had to be hospitalized for 11 days for his blood disease. (See Exhibits 18 and 20) Plaintiff returned to New York after he was discharged from the hospital in South Carolina and Defendant's records demonstrate that he immediately resumed his counseling sessions with Mr. Sturgis and Mr. Clark, attended AA meetings and treatment as an outpatient at Gracie Square until his hospitalization in June 1993 for his blood disease. (See Exhibit O, pp. 834, 843 - 845 attached to NLG Aff'd. of Def's. Mot.; Exhibit 5, Sturgis Depo. p. 29 line 20 to p. 30 line 22)

26.  The records of Defendant's EAP counselors, Messrs. Clark and Sturgis indicate that Plaintiff admitted to the use of alcohol and cocaine. (See Exhibit O, pp. 840 & 849 attached to NLG Aff'd. of Def's. Mot.) In addition, during his March 2, 2000 deposition in connection with the instant action Mr. Clark stated:

I believe that in his psychological interview while he was in Gracie Square with Dr. Baxter, I believe that he made some admission about his alcohol and drug use there as well. (See Exhibit 6, p. 30 lines 2 – 7; see also p. 27 line 22 to p. 30 line 7)

27. However, a review of Dr. Baxter's 5-page report of her psychological evaluation of Plaintiff shows that at no time during that evaluation did Plaintiff admit to "ever" using cocaine but he vehemently denied the use of cocaine and told Dr. Baxter that the urine samples which Defendant alleged were positive for cocaine, proved negative when retested by an independent laboratory. (See Exhibit 16, para. 1) Dr. Baxter's report on her psychological evaluation of Plaintiff also states:

> It is recommended that Mr. Robinson complete his treatment program for alcohol abuse and that consideration be given to whether the urinalysis results could have resulted from error, confusion of coercion of Mr. Robinson, possibly while under the influence of alcohol." (See Exhibit 16, p. 4 para. 3)

28. In addition, a review of the records of Washton and Gracie Square also indicate that Plaintiff never admitted to the use of cocaine. (See Exhibits 7, 8, 9, 15 and 19) In fact these records indicate that Plaintiff acknowledged that he drank alcohol socially and used marijuana occasionally for approximately one year 20 years ago.

29. In addition, Dr. Baxter's report states that Plaintiff had "good support and social resources available through his family, church and community." (See Exhibit 16, p. 4 para. 4) The records also show that at the time Defendant accused Plaintiff of abusing illegal drugs, he was 46 years of age, he had been married for 28 years and that union had produced four children, three of whom were adults and leading productive lives. His minor son and the youngest of his adult children lived with him and his wife. (See Exhibit 9) Defendant's allegations that Plaintiff had abused drugs and Plaintiff's

13

participation in Defendant's drug abuse in-patient and outpatient treatment programs, humiliated him before his family, church and community. On August 12, 1993 EAP counselor, Mr. Sturgis, wrote in his notes that during his counseling session with Plaintiff that Plaintiff "... appears to be following his treatment plan. Attempted to have a discussion about his situation was affecting relationship with wife." (See Exhibit O, p. 840, 8/12/93, attached to NLG Aff'd. of Def's. Mot.)

30. Plaintiff's activities as on outpatient in connection with the alleged drug abuse treatment, caused him to experience additional stress and fatigue, which further weakened him and aggravated his blood disease and caused him to be re-hospitalized at Downstate Medical Center in New York from June 2 – 7, 1993 and again on June 28 – July 3, 1993. Plaintiff was also hospitalized on June 17 and 18, 1993 at Kings County Hospital. In addition to these periods of hospitalization, Plaintiff had to be treated for his blood disease as an outpatient by his physicians on July 19 and 22, 1993 and August 2, 19, 25 and 26, 1993 as well as on several other occasions between May and August 1993. The records presented here by Defendant and Plaintiff show that Plaintiff provided Defendant with documentation of his hospitalizations and outpatient treatments for his non-drug-abuse-related illness during the period that Defendant mandated that he continue drug-abuse treatment as an outpatient at Gracie Square. (See Exhibit F, pp. 2 – 4 attached to NLG Aff'd. of Def's. Mot.; Exhibit O, pp. 841 - 845 attached to NLG Aff'd. of Def's. Mot.; Exhibits 18 and 20)

31. Despite his ill-health which **required** him to be repeatedly hospitalized for blood transfusions and other treatment, Defendant's records reveal that Plaintiff made every effort to continue the outpatient treatment for alleged drug abuse. (See Exhibit O,

pp. ___ ___ ___ (___ ___ ___ ___ Mot.) In a letter dated June 28, 1993 EAP counselor, Mr. Sturgis, wrote to Larry Bova and informed him that Plaintiff was "following his EAP treatment plan and has progressed sufficiently in treatment to return to duty." (See Exhibit O, p. 894 attached to NLG Aff'd. of Def's. Mot.)

32. On August 21, 1993, Plaintiff went to South Carolina to visit his elderly mother whose illness had worsened. (See Exhibit 20) Acting on Mr. Clark's instructions, Plaintiff obtained a letter from his mother's nursing home stating that he had visited with his mother between August 21 and 27, 1993. Plaintiff also received documentation from his physician regarding outpatient treatment that he had received for his blood disease on August 25 and 26, 1993. (See Exhibits 20 and Exhibit O, pp. 839 - 840 attached to NLG Aff'd. of Def's. Mot.) Also, Defendant's records indicate that Plaintiff's supervisor confirmed that Plaintiff could not attend the Gracie Square counseling session scheduled for August 25, 1993 because had to attend a Metro-North training class. (See Exhibit O, p. 837 attached to NLG Aff'd. of Def's. Mot.) On August 27, 1993, when Plaintiff submitted to Mr. Clark documentation of his visit with his mother in South Carolina and his August 25 – 26 visits to his physician for treatment for his blood disease, Mr. Clark refused to accept them and instead terminated Plaintiff from Defendant's EAP on the grounds of non-compliance with EAP recommended treatment. (See Exhibit 21)

33. Defendant terminated Plaintiff's enrollment in its EAP, even though Plaintiff had provided its EAP employees proof and documentation which showed that he had valid reasons for missing his sessions with Defendant's EAP counselors, AA meetings and outpatient treatment at Gracie Square from August 20 - August 27, 1993

15

and on any other occasion. (See Exhibits 20 and 21; Exhibit F, p. 9 para. 1 attached to NLG Aff'd. of Def's. Mot.; Exhibit O, pp. 837 – 838, 841 - 845 attached to NLG Aff'd. of Def's. Mot.)

34. Mr. Folmsbee, the union representative, told Plaintiff that since he was no longer in Defendant's EAP, his alleged illegal drug use would be investigated and if he was found guilty he would be fired and would not be able to be employed at another railroad. (See Exhibit F, p. 9 para. 2 attached to NLG Aff'd. of Def's. Mot.) From the attitude that Mr. Clark and Mr. Sturgis had exhibited towards him, Plaintiff had no reason to disbelieve that a disciplinary investigation would not result in the termination of his 16-year employment with Defendant. Based on the threat and fear of losing his job with Defendant, Plaintiff was relieved when his union representative, Mr. Folmsbee, spoke to Larry Bova, Superintendent of Transportation, about a transfer to Conrail. Mr. Bova approved a transfer to Conrail for Plaintiff. (See Exhibit H, p. 1168 attached to NLG Aff'd. of Def's. Mot. and Exhibit F, p. 9 para. 2 attached to NLG Aff'd. of Def's. Mot.)

35. Having worked with **Defendant** since 1976, Plaintiff had accumulated significant pension and seniority rights with Defendant. Defendant informed him that he could transfer his seniority rights to Conrail, pursuant to an agreement between Defendant and Conrail regarding transferred employees. (See **Exhibit H, p. 00079 attached to NLG Aff'd. of Def's. Mot.**) However, Conrail did not permit Plaintiff to exercise his seniority rights and Plaintiff faced a significant loss of pay and benefits. Plaintiff then asked to be reinstated with Defendant but his request was denied. (See Exhibit F, p. 9 para. 2 attached to NLG Aff'd. of Def's. Mot.)

to be transferred to Amtrak and that request was approved. Upon reporting for work at Amtrak, Plaintiff was informed that Defendant had not forwarded his personnel file to Amtrak. Subsequently, Amtrak as well as Plaintiff requested that Defendant transfer his personnel records to Amtrak but Defendant refused offering no reason or explanation for its refusal. Without his personnel records, Plaintiff could not commence his employment with Amtrak. (See Exhibit F, p. 9 para. 2 attached to NLG Aff'd. of Def's. Mot.) For Plaintiff to be "jerked around" in this fashion was a severe affront to his dignity and personhood, which worsened his blood disease and again led to hospitalizations on numerous occasions between February 8, 1994 and November 21, 1994. (See Exhibit F, p. 9 para. 2 attached to NLG Aff'd. of Def's. Mot.)

37. Defendant's conduct regarding Plaintiff's efforts to be employed by another railroad is indicative that Plaintiff's termination from Defendant's EAP for non-compliance with EAP recommendations meant the end of Plaintiff's 16 years of employment with the Defendant.

38. After his discharge from Gracie Square, Defendant informed Plaintiff that his employee insurance plan would not pay for the drug rehabilitation treatment and that he had an outstanding bill of $25,000 for said treatment. Defendant told Plaintiff he would be responsible for that bill if he did not enroll in another medical insurance plan, so he accepted the other plan, which was more expensive than his original plan and provided less coverage for his family. (See Exhibit F, p. 10 para. 2 attached to NLG Aff'd. of Def's. Mot.) Plaintiff would not have had to switch to a health insurance plan

with less coverage for him and his family if Defendant had not coerced him into a drug rehabilitation program.

39. Defendant's EAP employees conduct towards Plaintiff was motivated by nothing else but ill will, malice and anger at his trying to correct their errors, and a desire to punish him for insisting that they acknowledge and correct their errors which had caused him severe physical injuries, pain and suffering and emotional distress.

## Conclusion

Based on the legal theories presented in Plaintiff's Memorandum of Law and the facts herein, Plaintiff's claims are not preempted by the Railway Labor Act and can be maintained under the Federal Employees Liability Act, therefore, the claims in Defendant's motion for summary judgment and/or dismissal for lack of subject matter jurisdiction are without merit. Moreover, the records submitted here show that the issues to be decided are purely factual and therefore must be decided by the trier of facts.

WHEREFORE, based on the foregoing Plaintiffs pray that the court denies Defendant's motion in its entirety.

_Campbell McC. Holder_

Sworn to before me this 24th day of August, 2000

_Notary Public_

RUBYLETTE MATTHEW
Notary Public, State of New York
No. 02MA5082031
Qualified in Queens County
Commission Expires July 14, 2001

18