SUPREME COURT OF THE STATE NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
CHRISTINE ROBINSON as Administratrix
of the Estate of CHARLES ROBINSON (Deceased)
and CHRISTINE ROBINSON,                    Index No.: 102456/95

                          Plaintiff(s),    AMENDED
                                           VERIFIED
           - against -                     COMPLAINT

METRO NORTH COMMUTER RAIL ROAD,            FILED
THOMAS CLARK, MARK STESSNER ALAIN STURGIS,
and JOHN HERRLIN jointly and severally,    AUG 2 9 1997

                          Defendant(s).    COUNTY CLERK'S OFFICE
                                           NEW YORK
------------------------------------------------------------X

Plaintiff, Charles Robinson, by his attorney, Campbell Holder, Esq. complains of the Defendants, Metro-North Commuter Railroad, Thomas Clark, Mark Stessner, Alain Sturgis, John Herrlin, Gracie Square Hospital and B.J. Bittman and alleges that:

### I.    JURISDICTION

1.    The jurisdiction of this Court is predicated on the Federal Employer's Liability Act, USCA 45 Section 51 et seq.

### II.    VENUE

2.    Venue is based on the district in which the cause of action arose and in which the Plaintiff resides.

### III.    DESCRIPTION OF THE PARTIES

a. Plaintiff

3.    The Plaintiff, Charles Robinson (hereinafter "Plaintiff"), is a 49 year old man. He

is employed by Defendant Metro North Commuter Railroad, (hereinafter "Metro-North") as a conductor. Plaintiff commenced his employment with Metro-North in 1976 when said Defendant was known as Consolidated Rail Corporation. He has been a Metro-North conductor since 1980. He is currently on disability leave.

4. At all times relevant to this action, Plaintiff did and still does reside at 372 Blake Avenue, Brooklyn, New York 11212.

b. Defendant

5. The Defendant, Metro-North is a common carrier by railroad and engages in interstate commerce. At all times relevant to this action, Metro-North's principal place of business in the City of New York is Grand Central Terminal, 89 East 42nd Street, New York 10017.

6. The Defendant, Thomas Clark, (hereinafter "Clark"), is employed by Metro-North as the Manager of its Employee Assistance Program, (hereinafter "EAP"). At all times relevant to this action, Clark's principal place of business was and still is Grand Central Terminal, Lower Level, 89 East 42nd Street, New York 10017.

7. The Defendant, Mark Stessner, (hereinafter "Stessner"), is employed by Metro-North as a Hearing Officer. Upon information and belief, at all times relevant o this action, Stessner's principal place of business was and still is Grand Central Station, 89 East 42nd Street, New York, New York 10017.

8. The Defendant, Alain Sturgis, (hereinafter "Sturgis"), is employed by Metro-North as a Counselor in the EAP. Upon information and belief, at all times relevant o this action, his principal place of business was and still is 347 Madison Avenue, New York, New York 10017.

9. The Defendant, John Herrlin, (hereinafter "Dr. Herrlin"), is a medical doctor employed by Metro-North. Upon information and belief, at all times relevant to this action, Herrlin's principal place of business was Metro-North Medical, Grand Central Terminal, 89 East 42nd Street, New York, New York 10017.

### IV. NATURE OF CLAIMS

10. Plaintiff alleges that (i) Metro-North was negligent in its implementation of the EAP, its drug rehabilitation program and thereby caused him physical and emotional injury; (ii) Metro-North was negligent in that although requiring him to participate in a drug rehabilitation program, to wit: at Gracie Square Hospital, it failed to ensure his physical safety while he participated in the program and that he sustained physical and emotional injuries because of this negligence; (iii) he sustained physical and emotional injuries as the result of the severe emotional distress intentionally caused him by the employees and agents of Metro-North, to wit: Thomas Clark, Mark Stessner, Alain Sturgis and John Herrlin; (iv) that Metro-North was negligent in supervising these employees and agents and thereby caused him physical and emotional injury; (v) he sustained physical and emotional injury as a result of Metro-North's negligent supervision of its agent Grace Square Hospital; (vi) he suffered physical and emotional injury as a result of Metro-North's neglient infliction of emotional distress

### AS AND FOR A FIRST CAUSE OF ACTION

11. On or about July, 1992, Plaintiff suffered physical injuries in an automobile accident. As a result of his injuries, Plaintiff was placed on disability leave from his job as conductor with Metro-North.

12. On or about August, 1992, Plaintiff received a medical evaluation by Dr. Herrlin

at Metro-North Medical facility. Plaintiff still suffered from his injuries and consequently, he did not receive approval to return to work from Dr. Herrlin.

13. On or about September, 1992, Plaintiff was given a second medical evaluation by Dr. Herrlin. He was still injured and again, he did not receive Dr. Herrlin's approval for his return to work.

14. On or about October, 1992, Plaintiff was given his third medical evaluation by Dr. Herrlin. Plaintiff received Dr. Herrlin's approval for his return to work.

15. In all three of Plaintiff's medical evaluations, Plaintiff was required to submit a urine sample for testing.

16. On the same day that Plaintiff received to resume his duties, he notified his union representative, one Ronald Folmsbee, (hereinafter "Folmsbee") and his supervisor in the transportation department, one Jimmy Martin, of the approval. The supervisor notified the crew dispatcher, one Jimmy Keiller, that Plaintiff should be allowed to return to work.

17. Upon information and belief, Dr. Herrlin also notified Folmsbee that Plaintiff was medically fit to return to work.

18. On or about October 3, 1992, Plaintiff's son answered a telephone call from the aforementioned crew dispatcher. Plaintiff returned the call on or about October 4, 1992. The crew dispatcher stated that Plaintiff could not return to work the following day because Plaintiff's "urine was bad".

19. When questioned by Robinson, the crew dispatcher stated that he did not know who the information about the urine came from. He also told Plaintiff that the information came for a note left on his desk.

20. Upon information and belief, it was inconsistent with Metro-North regulations for

the crew dispatcher to have information regarding Plaintiff's urine. Instead, Plaintiff should have been notified by the transportation supervisor or Metro-North's medical personnel that he could not return to work.

21.     On or about October 5, 1992, Plaintiff notified this union representative that he was not allowed to return to work because of an alleged positive urinalysis test. The union representative then sent Plaintiff to Roche Laboratory for a urine test.

22.     On or about October 6, 1992, Plaintiff accompanied his union representative to Stessner's office. Stessner told Plaintiff that he, Plaintiff, had two choices - he could "join Metro-North's drug rehabilitation program or have a hearing and be fired".

23.     Metro-North enrolled Plaintiff in its EAP at the Washton Institute located at Park Avenue, New York, New York. Plaintiff was required to attend the program two days per week and provide urine samples twice per week. He continued to work as a Metro-North conductor while he participated in the program.

24.     On or about October 8, 1992, Roche Laboratories notified Plaintiff's union representative that it could not test Plaintiff's urine sample because the seal on his sample container was broken.

25.     Metro-North then informed Plaintiff's union representative that it would not accept any test results on Plaintiff's urine sample at Rocher Laboratories because that sample was taken three days after his last Metro-North sample.

26.     On or about February 8, 1993, Plaintiff's counselor at the Washton Institute told Plaintiff that various drugs were found in his urine sample. The urine samples which Plaintiff provided on or about February 4, 1993 and on or about February 11, 1993 were found to be drug-free.

27. As required by Metro-North's regulations, Plaintiff notified Sturgis of the alleged positive urinalysis result of February 8, 1993. Sturgis accused Plaintiff of being a drug-addict and informed him that if he wanted to keep his job, he had to participate in an in-patient program at a medical care facility.

28. On or about February 9, 1993, Plaintiff and his personal physician, Dr. Needles, requested by letter that the Washton Institute send Plaintiff's doctor the February 8 urine sample to Roche Laboratory for testing. Approximately three days later, Washton Institute approved the release of the urine sample. However, the laboratory which conducts urinalysis for Washton Institute did not sent Plaintiff's urine sample to Roche Laboratory until eight or nine days after Washton Institute's release of the sample.

29. Upon receipt of Plaintiff's February 8, 1993, urine sample, Roche Laboratory conducted its tests and found no trace of drugs in Plaintiff's urine. By the time Roche Laboratory completed its tests on his urine sample, Plaintiff had already been confined to Metro-North's in-patient drug rehabilitation program at the Hospital for approximately one week.

30. Upon information and belief, the Hospital gave Plaintiff blood and urine tests to ascertain whether there was evidence of drug use. Upon information and belief, both tests showed no drug use by Plaintiff.

31. The Hospital also tested Plaintiff's blood for evidence of anemia. Upon information and belief, Plaintiff's blood test showed that he was severely anemic and required emergency care.

32. Following the negative urinalysis results, Roche Labs notified Plaintiff's personal physician of the test results. Dr. Needles in turn notified Metro-North and the Hospital

33. Upon information and belief, the Hospital objected to Plaintiff's continued participation in the in-patient when it was learned that no drugs were to be found in his urine.

34. Upon information and belief, Metro-North refused to permit Plaintiff to leave the in-patient program although it was aware of the negative urinalysis results on Plaintiff's February 8, 1993, urine sample.

35. Upon information and belief, Metro-North instructed the Hospital that Plaintiff was not to be released from the in-patient program unless he voluntarily walked out of the Hospital. Metro-North also told Plaintiff that if he voluntarily left the in-patient program he would be fired.

36. Upon information and belief, when the Hospital continued to objects to Plaintiff's participation in the in-patient program, Metro-North hired an independent psychoanalyst. Metro-North then required Plaintiff undergo psychoanalysis on the pretext of assessing his mental health.

37. Plaintiff was not released from the Hospital's in-patient program for treatment of subsistence abuse until on or about March 28, 1993, more than one month after both Metro-North and the Hospital were aware of his negative urinalysis.

38. Despite test results showing no evidence of drugs in Plaintiff's urine sample of February 8, 1993, Metro-North still required that Plaintiff participate in an out-patient program for substances abuse at the Hospital after he was released from the in-patient program.

39. On or about April 2, 1993, Plaintiff met with Surgis at Metro-North. Sturgis told

Plaintiff that Plaintiff should continue meeting with him so that he, Sturgis, could determine when Plaintiff was fit to return to work.

40. On the same day that Plaintiff met him, Sturgis telephoned Plaintiff and informed him that Clark wanted to talk to Plaintiff.

41. On or about April 3, 1993, Plaintiff and a union representative, one Jimmy Phelan, had a meeting with the aforementioned supervisor. During this meeting, the supervisor specifically told Plaintiff that he did not want to hear anything more about "the bad urine" and that if he ever heard anything more about it, Plaintiff would be "out of Metro-North".

42. On or about April 4, 1993, Plaintiff visited the State of South Carolina to visit his sick mother. On the same day, he was rushed to the emergency room of Bamberg County Memorial Hospital located in South Carolina. Plaintiff was found to be severely anemic.

43. Plaintiff was subsequently moved to Orageberg Regional Medical Center located in South Carolina. Plaintiff was given seven pints of blood to correct his anemia. Plaintiff remained hospitalized in Orangeberg Regional Medical Center for fourteen days.

44. During his period of hospitalization, Plaintiff notified Sturgis by telephoned that he was ill and could not return to work nor participate in the out-patient program at the Hospital. Sturgis told Plaintiff that he was excused from the program during his illness.

45. Plaintiff subsequently returned to New York City where he continued to receive regular medical treatment for his severe anemia. On various occasion, Plaintiff had to be hospitalized because of his anemia.

46. Plaintiff returned to work at Metro-North on or about July 22, 1993. Upon his return to work, Metro-North enrolled him in the out-patient substance abuse program at

the Hospital. The program required Plaintiff to attend meetings three nights per week

47. On or about July 22, 1993, Clark called Plaintiff and Phelan into his office. He told them that Metro-North had a report from the Hospital stating that Plaintiff did not attend any of the previous out-patient meetings. Plaintiff explained the reasons for his absence.

48. On or about August, 1993, Plaintiff again returned to South Carolina to visit his mother. Plaintiff informed Clark that he was leaving for South Carolina. Clark instructed Plaintiff to bring some proof to show that he was actually in South Carolina. Plaintiff produced a letter from his mother's nursing home and a letter from a hospital in South Carolina where he received medical treatment during his visit.

49. When Plaintiff returned to work in New York, he provided Clark with the evidence of his whereabouts during his absence from work. Clark refused to accept Plaintiff's documents and told Plaintiff that he would be fired.

50. Metro-North subsequently offered Plaintiff a transfer to another railroad in lieu of being fired. Plaintiff chose to transfer to Amtrak.

51. Before Plaintiff could work at Amtrak, Metro North required that he first transfer to Consolidated Railroad for a minimum of thirty days. Plaintiff spent the requisite thirty days at Consolidated Railroad and then transferred to Amtrak.

52. Plaintiff received his Amtrak uniform, rule book and a physical examination. Amtrak also scheduled a revenue class for Plaintiff to attend.

53. On the day that Plaintiff showed up for the revenue class, the revenue accounting clerk at Amtrak informed Plaintiff that he had to call the Amtrak superintendent of the North Eastern District. When Plaintiff spoke to the Amtrak superintendent he was told that Amtrak needed his personnel file from Metro-North. Plaintiff asked the

superintendent to request the file form Metro-North.

The superintendent did ask Metro-North for Plaintiff's file. Metro-North refused to transfer Plaintiff's personnel file to Amtrak. As of the date of this cause of action, Metro-North still has not turned Plaintiff's file over to Amtrak.

54. Consequently, as of the date of this cause of action, Plaintiff has not been allowed to work at Amtrak, Plaintiff has not been fired by Metro-North.

55. Metro-North owed Plaintiff the duty of conducting its Employee Assistance Program with due care and diligence.

56. Metro-North did breach its duty of care owed to Plaintiff.

57. Metro-North knew or should have known that its breach of duty would of cause harm to Plaintiff.

58. Plaintiff did in fact suffer severe emotional and physical injury as the result of Metro-North's breach of its duty of care.

59. That by reason of the foregoing conduct of Metro-North the Plaintiff was damaged in the amount of FIVE MILLION (5,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION

60. Plaintiff realleges paragraphs 1 through 58.

61. Certain Metro-North employees and agents, to wit: Clark, Stessner, Sturgis and Dr. Herrlin, abused their positions of employment to intentionally intimidate, threaten and harass Plaintiff.

62. The aforementioned employees knew or should have known that their conduct was unconscionable and that it would cause harm to Plaintiff.

63. Plaintiff did suffer severe physical and emotional injury as the result of the behavior

of the aforementioned employees.

64. Wherefore, Plaintiff seeks damages in the amount of ONE MILLION (1,000,000.00) DOLLARS.

## AS AND FOR A THIRD CAUSE OF ACTION

65. Plaintiff realleges paragraphs 1 through 58 and 60 through 63.

66. Metro-North was negligent in its supervision of the aforementioned employees and agents in that it placed these employees and agents in the position to cause harm to Plaintiff.

67. Metro-North knew or should have known that such negligent employment and supervision of these employees and agents would cause harm to Plaintiff.

68. Plaintiff did suffer physical and emotional injury as a result of Metro-North's negligent supervision and employment of the aforementioned employees and agents.

69. Wherefore Plaintiff seeks damages in the amount of ONE MILLION (1,000,000.00) DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION

70. Plaintiff realleges paragraphs 1 through 58, 60 through 63 and 65 through 68.

71. Upon Plaintiff's admission to the in-patient program for substance abusers at the Hospital, Plaintiff received a medical evaluation. Plaintiff was also given various blood and urine tests.

72. The results of Plaintiff's blood tests showed that he was severely anemic. His tests showed that there were no illegal substances in Plaintiff's blood or urine.

73. Despite the blood test results and Plaintiff's medical history of anemia, the Hospital failed to make appropriate measures to correct Plaintiff's anemia.

74. Throughout Plaintiff's participation in the Hospital's in-patient program, he complained of symptoms of anemia. The Hospital continued to be aware of the severity of Plaintiff's anemia. Nonetheless, the Hospital provided Plaintiff with no medical treatment for his illness.

75. The Hospital did not inform Plaintiff of his medical condition until the day he was released from the in-patient program. Furthermore, the Hospital misinformed Plaintiff about the severity of his condition.

76. Approximately one week after his release from the in-patient program, Plaintiff collapsed and required emergency medical care. Plaintiff was found to be severely anemic.

77. Plaintiff was so anemic, he had to be given several pints of blood and was hospitalized for fourteen days.

78. Upon information and belief, during the time Plaintiff was confined to the Hospital's in-patient program, the Hospital knew or should have known that test results which showed the presence of drugs in Plaintiff's urine were incorrect.

79. The Hospital nevertheless failed to release Plaintiff from the in-patient program.

80. The Hospital knew or should have known that Plaintiff was severely anemic and was in a life-threatening condition.

81. The Hospital failed to provide Plaintiff with adequate medical care during his confinement to the in-patient program and thereby endangered his life.

82. At all times during Plaintiff's participation in the program the Hospital acted as the agent of Plaintiff's employer, Metro-North.

83. Metro-North knew or should have known that Plaintiff suffered from anemia.

84. Metro-North required that Plaintiff be confined to the Hospital's in-patient

program and insisted on his continued hospitalization even when his urine test showed no evidence of drug use. Metro-North therefore owed Plaintiff the duty of ensuring his physical safety while he participated in the program.

85. Metro-North knew or should have known that unless it ensured Plaintiff's physical safety while he was confined to the Hospital, Plaintiff would be harmed.

86. Plaintiff did suffer physical injury as the result of Metro-North breach of its duty of care.

## AS AND FOR THE FIFTH CAUSE OF ACTION

87. That by reason of the foregoing conduct of Metro-North, the Plaintiff was damaged in the amount of TWO MILLION (2,000,000.00) DOLLARS.

88. Plaintiff realleges paragraphs 1 through 58, 60 through 63, 65 through 68 and 70 through 86.

89. Metro-North placed Plaintiff in the position to be harmed by its agent, the Hospital. Having done so, it then failed to adequately supervise the Hospital's care of Plaintiff.

90. Consequently, Plaintiff sustained serious physical injury while confined to the Hospital an upon release from the in-patient program.

91. Wherefore, Plaintiff seeks damages in the amount of ONE MILLION (1,000,000.00) DOLLARS.

## AS AND FOR SIXTH CAUSE OF ACTION

92. Plaintiff realleges paragraphs 1 through 58, 60 through 63, 65 through 68, 70 through 86, and 88 through 90.

93. Through its agents and employees, Metro-North conducted and did allow to be

conducted a sustained campaign of harassment against Plaintiff.

94. Metro-North knew or should have known that the actions of its agents and employees would cause Plaintiff severe emotional distress and physical injury.

95. Metro-North, through its agents and employees did cause Plaintiff severe emotional distress and physical injury.

96. By reason of the foregoing, Plaintiff CHARLES ROBINSON has been damaged in the sum of ONE MILLION ($1,000,000.00) DOLLARS.

### AS AND FOR A SEVENTH CAUSE OF ACTION ON BEHALF OF PLAINTIFF, CHRISTINE ROBINSON

97. That at all times mentioned in the complaint, Plaintiff, CHRISTINE ROBINSON, was and still is the wife of Plaintiff and resides with him at 372 Blake Avenue, Brooklyn, New York 11212.

98. That by reason of the foregoing, this Plaintiff has been deprived of the comfort, services, companionship and society of her husband and has incurred and will continued to incur great expenses incident to his medical care treatment, all to her damages of ONE MILLION (1,000,000.00) DOLLARS.

99. That the amount of damages sought in this action exceeds the jurisdiction limits of lower courts which would otherwise have jurisdiction.

### AS AND FOR AN EIGHTH CAUSE OF ACTION

100. Plaintiff realleges paragraphs 1, 2, 5 through 53, and 55 through 99.

101. Subsequently to the commencement of this action Charles Robinson deceased, died on February 11, 1996, leaving distributees surviving.

102. Christine Robinson was duly appointed administratrix of Charles Robinson's estate.

103. The death of the decedent Charles Robinson was caused solely and wholly by the negligence, recklessness and carelessness of defendant's in their implementation, control and operation during rehabilitation program, of Metro-North EAP.

104. That as a consequence of the injuries and the death of Charles Robinson, Plaintiff, Christine Robinson has been deprived of the services of her husband, including but not limited to comfort and happiness of his society, care advice, guidance, consortium and companionship and this Plaintiff's happiness, comfort, peace of mind, well being and contentment have been and continue to be and shall be impaired.

105. By reason of the foregoing Plaintiff Christine Robinson has been damaged in the sum of One Hundred Million Dollars ($100,000,000.00)

WHEREFORE, the Plaintiff demands judgment against the defendants:

a) On the first cause of action in the sum of FIVE MILLION ($5,000,000.00) DOLLARS;

b) On the second cause of action in the sum of ONE MILLION ($1,000,000.00) DOLLARS;

c) On the third cause of action in the sum of ONE MILLION ($1,000,000.00) DOLLARS;

d) On the fourth cause of action in the sum of TWO MILLION ($2,000,000.00) DOLLARS;

e)  On the fifth cause of action in the sum of ONE MILLION (1,000,000.00) DOLLARS;

f)  On the sixth cause of action in the sum of ONE MILLION (1,000,000.00) DOLLARS;

g)  On the seventh cause of action in the sum of ONE MILLION (1,000,000.00)

h)  On the eighth cause of action in the sum of ONE HUNDRED MILLION (100,000,000.00) DOLLARS

i)  Punitive damages in the sum of ONE MILLION ($1,000,000.00) DOLLARS;

together with the costs and disbursements of this action.

Dated: New York, New York
August 25, 1997

Yours,

CAMPBELL HOLDER & ASSOCIATES
Attorney for Plaintiff
401 Broadway, Suite 602
New York, New York 10013
(212) 966-7313

**ATTORNEY'S VERIFICATION**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

**FILED**

AUG 29 1997

COUNTY CLERK'S OFFICE
NEW YORK

The undersigned, an attorney duly admitted to practice in the courts of New York State, states, that affirmant is a member of the firm of LAW OFFICE OF CAMPBELL HOLDER & ASSOCIATES, the attorneys for the Plaintiff, that the Plaintiff has read the foregoing **AMENDED VERIFIED COMPLAINT** and knows the contents thereof, and that the same is true to affirmant's knowledge, except as to those matters therein stated to be alleged upon information and belief, and that as to those matters affirmant believes them to be true.

That the reason why this verification is made by affirmant and not by the Plaintiff is because the Plaintiff is not within New York County where the attorneys maintains their offices; and that source of knowledge, and the grounds of belief as to those matters therein stated to be alleged on information and belief are correspondence and investigations which have been made concerning the subject matter of this action, and which are in the possession of said attorneys.

The undersigned affirms that the foregoing statements are true, under the penalties of perjury.

Dated: New York, New York
August 25, 1997

*Campbell McC. Holder*

CAMPBELL McC. HOLDER, ESQ.