of violence in a labor dispute." Mack, 878 F.2d at 679 (quoting Farmer, 430 U.S. at 299, 97 S.Ct. at 1063). The Farmer Court further held that, "'the particularly abusive manner in which the [tort] is accomplished ...' is the key to determining if an exception is warranted." Farmer, 430 U.S. at 305, 97 S.Ct. at 1066.

The records clearly demonstrate that not only is the instant action the peripheral concern of the labor law but the particularly abusive manner in which the tort was accomplished would cause it to be exempted from preemption. In order to continue his 16-year employment with Defendant, Plaintiff had to participate in an outpatient drug-abuse treatment program for approximately four months as a result of a false positive reading of his urine sample in connection with a fitness-for-duty medical examination. **(See Exhibit 5, Sturgis Depo. p. 11 line 13 to p. 18 line 18; Exhibit O, pp. 834 – 851, 892 – 893 & 889, attached to NLG Aff'd. Def's. Mot.)** Then, under the threat of losing his job, Defendant confined Plaintiff to a psychiatric institution for 29 days to undergo substance abuse treatment, again, based on a subsequent false positive reading of his urine sample. **(See Exhibits 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17; see also Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.)**

The records show that during his confinement in the psychiatric facility, Plaintiff showed no signs or symptoms of drugs or alcohol withdrawal. **(See Exhibit 15, p. 2 para. 3)** Yet, Defendant continued to place Plaintiff in daily and continuous fear of physical harm from persons in that facility who were experiencing withdrawal symptoms from their drug addiction. **(See Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.)** Defendant then directed the psychiatric institution, in which it had Plaintiff confined, not to release him even though within 2 days of the commencement of his confinement in the psychiatric facility, Defendant was made aware that the re-test of Plaintiff's urine sample, on which its decision to confine him for drug abuse treatment was based, showed no

evidence that Plaintiff had ingested illegal drugs or was ever addicted to illegal drugs. **(See Exhibits 11, 14 and 15, p. 2 para. 3; Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.)**

During his confinement to the psychiatric facility for alleged drug abuse, for which Defendant had no evidence or at best the evidence it had was based on test results which were highly questionable, Defendant was aware of Plaintiff's blood disease but refused to treat this condition or release him so that he could seek medical attention for his life-threatening illness which was causing him to experience unnecessary physical pain and suffering. **(Exhibits 11, 14, 15 and 19; Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.)** Defendant's refusal and failure to treat Plaintiff's life-threatening blood disease or to release him so that he could obtain medical attention for his illness aggravated his blood disease and required several periods of hospitalization upon his release from Defendant's in-patient drug abuse program. **(See Exhibits 17, 18, 19 and Exhibit F, pp. 3 – 4 attached to NLG Aff'd. of Def's. Mot.)**

In addition, Defendant's EAP employees were fully informed by Plaintiff of his blood disease that caused him to be repeatedly hospitalized during the months of April, June and July 1993. **(See Exhibits 18 and 20, Exhibit 6, Clark Depo. p. 31 line 21 to p. 34 line 22; Exhibit O, pp. 841 - 845 attached to NLG Aff'd. of Def's. Mot.)** Nevertheless, Defendant ignored Plaintiff's illness and weakened physical condition and insisted that he continue treatment for alleged drug abuse or subject himself to disciplinary proceedings which would more than likely have resulted in the termination of his 16-year employment with Defendant. **(See Exhibit 6, Clark Depo. p. 17 line 15 to p. 18 line 8; Exhibit 5, Sturgis Depo. p. 29 line 20 to p. 32 line 22; Exhibit O, pp. 892 – 893, & 889 attached to NLG Aff'd. of Def's. Mot.)**

Due to these various periods of hospitalizations Plaintiff was unable to attend all of the counseling sessions with EAP and Gracie Square, as well as AA meetings. Defendant never investigated the reasons for Plaintiff's repeated hospitalizations in April, June and July 1993, which

began immediately after his discharge from Gracie Square but instead continued to interpret his absences from counseling sessions and AA meetings as being in denial of his alleged drug abuse and, therefore, not responding to treatment. **(See Exhibit 6, Clark Depo. p. 31 line 21 to p. 34 line 22; Exhibit O, pp. 834, 837 – 845, 892 - 893 attached to NLG Aff'd. of Def's. Mot.)** Defendant EAP employees also ignored the fact that despite his objections to undergoing outpatient drug abuse treatment because the results of his urine sample showed a false positive reading, Plaintiff cooperated fully with Defendant's EAP in that he attended 90-minute counseling sessions three times per week for approximately 11 weeks as an outpatient at Washton and the progress report, prepared by his counselor at Washton, indicated no problems with Plaintiff's attendance or any other matter regarding his participation in that outpatient drug-abuse treatment program. **(See Exhibit 8, 9 and Exhibit O, pp. 848 - 850 attached to NLG Aff'd. of Def's. Mot.)**

The records here indicate that, Defendant was unrelenting in requiring Plaintiff to participate as an outpatient in a drug-abuse treatment program upon his release from the psychiatric institution and during his various hospitalizations for his blood disease, even though Defendant was aware that the re-test of Plaintiff's urine samples showed no evidence of substance abuse and his hospitalization records at Gracie Square also showed no evidence of drug addiction or evidence of past, present or recent use of illegal drugs. **(See Exhibits 11, 14 and 15 and Exhibit O, pp. 841 - 845, 892 – 893 attached to NLG Aff'd. of Def's. Mot.; see also Exhibit 6, Clark Depo. p. 31 line 21 to p. 34 line 22)** As a matter of fact, paragraph 3 on page 2 of Gracie Square's Summary states that Plaintiff's "medically supervised detox required psychopharmacologic treatment with vitamins only" which indicates that Plaintiff required no medication for alleged detoxification while he was confined to Gracie Square. **(See Exhibit 15, p. 2 para. 3)**

The records also reveal that Defendant's efforts to justify its confinement of Plaintiff to a psychiatric facility for alleged drug abuse by ordering that he undergo psychoanalysis, rather

18

supported Plaintiff's claim that his urine tests showed false positives in that the psychoanalysis report states "that consideration be given to whether the urinalysis results could have resulted from error confusion or coercion of Mr. Robinson." **(See Exhibit 16, p. 4 para. 3)** Despite these recommendations Defendant's EAP employees, Messrs. Sturgis and Clark, refused to review and investigate the re-test of Plaintiff's urine samples which indicated that the positive readings of Plaintiff's urine samples were incorrect. **(See Exhibits 10, 11 and 14; Exhibit 6, Clark Depo. p. 13 line 8 to p. 14 line 8, p. 24 lines 15 – 20; Exhibit 5, Sturgis Depo. p. 16 line 13 to p. 22 line 22; Exhibit O, pp. 846 – 847 attached to NLG Aff'd. of Def's. Mot.)** Instead, Messrs. Sturgis and Clark continued to force Plaintiff to exert himself in his weakened physical condition by mandating that in order to keep his employment with Defendant, that he undergo outpatient treatment for alleged drug abuse after he had been released from Gracie Square. Moreover, the records presented by both Plaintiff and Defendant show that Plaintiff provided Defendant with credible evidence of his hospitalizations and outpatient treatment for non-drug-abuse-related illness. **(See Exhibits 18, 20 and Exhibit O, pp. 841 – 845 attached to NLG Aff'd. of Def's. Mot.)** The records herein make clear that Plaintiff's coerced participation in Defendant's drug abuse treatment program, proved detrimental to his physical well-being and worsened his life-threatening blood disease which required repeated hospitalizations and caused him great physical pain and suffering. **(See Exhibit F, pp. 2 - 4 attached to NLG Aff'd. of Def's. Mot.)**

The psychological analysis also noted that Plaintiff enjoyed "good support and social resources available through family, church and community." **(See Exhibit 16, p. 4 para. 4)** His forced confinement to a psychiatric institution for alleged drug abuse certainly humiliated him before his family, church, community and co-workers. As in Mack v. Metro-North, 878 F.Supp. 673, Defendant's entire conduct described herein in connection with its fitness-for-duty medical examinations of Plaintiff sufficiently satisfies the test of outrageous conduct to merit a denial of

19

Defendant's contention, Plaintiff's allegations in his sixth cause of action are not primarily related to the CBA and are within the historic concerns of the state protecting the health and welfare of its citizens. Mack v. Metro-North Railroad, 878 F.Supp. at 678.

Moreover, the court in Mack v Metro-North, 876 F.Supp. 490, 492, quoting Hawaiian Airlines, supra, noted:

> Even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for section 301 preemption purposes. Hawaiian Airlines, 512 U.S. at __, 114 S. Ct. at 2249, quoting Lingle, 486 U.S. at 410, 108 S.Ct. at 1883.

Also, in Mack v Metro-North, 876 F.Supp. 490, the court held that the tort claim of intentional infliction of emotional distress requires no interpretation of the CBA. Therefore, contrary to Defendant's contention here Plaintiff's claim for intentional infliction of emotional distress is not preempted by the RLA.

## POINT IV

## PLAINTIFFS' CLAIMS ARE SUSTAINABLE UNDER A PROPER APPLICATION OF FELA

While acknowledging that Plaintiff in the instant case alleges that Defendant's conduct placed him in constant fear of physical violence at Gracie Square which resulted in his injuries, Defendant claims that Plaintiff's injuries are 'purely emotional' and do not relate to a fear of physical impact and are, therefore, not cognizable under FELA because his allegations do not suggest that he was ever placed in danger of an immediate physical impact. **(See Def's. Memo. at 19)**

Contrary to Defendant's claims, Plaintiff clearly states in his answers to Defendant's Interrogatories that during his coerced confinement at Gracie Square, he was in daily fear of immediate physical harm from other patients at Gracie Square most of whom were drug addicts and

who were experiencing drug-abuse withdrawal symptoms. **(See Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.)** In addition, Defendant placed Plaintiff in a hostile and unsafe environment when its EAP employees confined him to a psychiatric facility for drug-abuse treatment with drug addicts who were experiencing withdrawal symptoms and who constantly threatened Plaintiff with physical violence. Plaintiff's fear of immediate physical harm was significantly increased when Defendant continued to confine him in the unsafe and hostile environment at Gracie Square for an additional 24 days after it had obtained from a reliable source that the re-test of Plaintiff's urine sample was negative for any illegal drug use by Plaintiff and, therefore, the positive reading, upon which Defendant's decision to confine Plaintiff to Gracie Square was based, was false. **(See Exhibits 11, 14, 15, p. 2 and 22 )**

Courts have repeatedly held that allegations, similar to the Plaintiff's in the instant action, are indeed sustainable under FELA. For example, in Riddle v. National R.R. Passenger Corp., 831 F.Supp. 442 (1993, ED Pa), the court denied defendant's motion to dismiss plaintiff's claims alleging that the defendant railroad negligently inflicted emotional distress upon him. There the plaintiff employee did not allege physical contact but, as the Plaintiff in the instant case, did allege that defendant railroad placed him in an unsafe and hostile environment by conducting sustained and intentional campaign of investigations and harassment of him and that his injuries resulted from defendant railroad's negligence and were the foreseeable result of defendant railroad's conduct. The Riddle Court further stated that in light of the liberal pleading standards and undeveloped state of record, and because no single common-law standard exists for weighing genuineness of emotional injury claims, the employee should be given every opportunity to develop a factual record in support of his allegations. Id.

Again in Bloom v. Conrail, 812 F.Supp. 553 (1993, ED Pa) the court held that the railroad engineer's FELA cause of action against Conrail will not be denied summarily, because fact

21

questions are presented as to the reasonableness of defendant Conrail and its patrolman's actions, where the patrolman forced the plaintiff to witness the aftermath of a pedestrian's suicide immediately after the pedestrian intentionally stood on the track in front of his train to commit suicide. Id.

In addition, the Second Circuit has held that the railroad maintenance man's FELA action against the railroad for emotional distress will not be summarily denied because the employee could recover for fear of developing AIDS because defendant's negligence occurred under circumstances that would cause a reasonable person to develop a fear of AIDS. Marchica v. Long Island, R.R., 31 F.3d 1197, 9 BNA IER Cas 1560 (2d Cir. 1994).

Similarly, in the case at bar, Plaintiff's cause of action is cognizable under FELA because Defendant's negligence caused Plaintiff, whose medical records indicate no evidence of past or present drug abuse, to be confined in a psychiatric facility for drug abuse treatment for an extended period of time, with drug addicts who were experiencing withdrawal symptoms and who threatened Plaintiff with physical violence; such circumstances would cause a reasonable person to develop a fear of immediate physical harm and Plaintiff should be given every opportunity to develop a factual record in support of his allegations so that the matter can be resolved on its merits. Marchica v. Long Island R.R., supra, Riddle v. National R.R. Passenger Corp., supra, Bloom v. Conrail, supra. See also, Robinson v. Metro-North, Index No. 102456/95, where the court in the instant action, citing Bullard v. Billings & Spencer Co., 36 A.D.2d 71, denied Defendant's prior motion to dismiss the instant action on the identical issues now raised by Defendant's instant motion. (Huff, J.) **(See Exhibits 1 and 2, pp. 4-8)**

22

POINT V

## PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IS COGNIZABLE UNDER FELA AND DEFENDANT'S CONDUCT RISES TO THE LEVEL OF OUTRAGEOUSNESS

Defendant also contends that Plaintiff's asserts a cause of action for intentional infliction of emotional distress and this claim must fail for the following reasons:

(1) there can be no such claim absent physical danger; and

(2) plaintiff's allegations do not rise to the level necessary to state an intentional infliction of emotional distress claim. (See Def's. Memo. at 23)

Again, Defendant is barred from relitigating this issue because in deciding Defendant's prior motion in this action (See Point I above) this issue has been judicially determined and conclusively settled by the court's July 17, 1997 judgment and decision attached hereto as **Exhibit 1**. Fleischer v. Uccelini, 81 Misc.2d 22, 365 N.Y.S.2d 722 (1975); Kartiganer Associates, P.C. v. Wehran Engineering, P.C., 92 A.D.2d 911, 460 N.Y.S.2d 124 (1983); Green v. Sante Fe Indus., 70 N.Y.2d 244; Firedoor Corp. v. Merlin Indus., 86 A.D.2d 577. Should the court find that Defendant is not collaterally estopped from relitigating this issue then Plaintiff opposes this claim as follows:

In Point IV of its memorandum of law in support of the instant motion, Defendant states that neither the Supreme Court nor the Second Circuit has expressly addressed the issue of whether claims of intentional infliction of emotional distress are cognizable under FELA. Citing Hagerman v. Metro-North Commuter R.R., 1995 WL 614562 (S.D.N.Y.), Defendant states that "courts have interpreted FELA to apply to some intentional torts." But, a FELA plaintiff may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in supervising its employees. Lancaster v. Norfolk & W. R. Co., 773 F.2d 807 (1985, CA7 Ill).

In the instant case the alleged tort against the Plaintiff herein was committed in furtherance of Defendant's objective and by the negligent supervision of its EAP employees. (See Exhibit 5,

23

Sturgis Depo. p. 7 line 11 to p. 8 line 5; Exhibit 6, Clark Depo. p. 12 line 3 to p. 13 line 7)

Moreover, contrary to Defendant's claim that Plaintiff cannot establish that Defendant caused him to experience a threat of physical harm, the record shows that Defendant placed Plaintiff in physical danger for 30 days when it confined him to a psychiatric institution for drug abuse treatment with drug addicts who were experiencing withdrawal symptoms and who threatened Plaintiff with physical violence. **(See Exhibit F, p. 7 attached to NLG Aff'd. of Def's. Mot.)** The records also demonstrate that Plaintiff has no history of drug addiction and therefore experienced no drug withdrawal symptoms during his confinement at Gracie Square and as an outpatient at Washton and Gracie Square. **(See Exhibits 15 and 16)**

Defendant's repeated claim that Plaintiffs' allegations rest on "purely emotional injuries" **(See Def's. Memo. at 25)** is clearly an attempt to have the court ignore, as did its EAP employees and agents, the physical injuries Plaintiff suffered when his blood disease was aggravated by Defendant's negligence and he had to be repeatedly hospitalized upon his release from Defendant's in-patient drug abuse program because Defendant inexcusably failed to treat Plaintiff's blood disease and refused to release him to obtain medical attention for his life-threatening illness. **(See Exhibits 15, 17 and 19)** In addition, Defendant's EAP Employees continued to aggravate Plaintiff's physical injuries by mandating, under the threat of facing disciplinary proceeding and losing his 16-year employment with Defendant, that upon his release from Gracie Square he must continue to undergo drug abuse treatment. **(See Exhibit 21; see also Exhibit 5, Sturgis Depo. p. 22 lines 11 – 16, p. 25 line 24 to p. 26 line 18; Exhibit 6, Clark Depo. p. 30 lines 8 - 19; Exhibit O, pp. 834, 839 – 846, and 892 - 893 attached to NLG Aff'd. of Def's. Mot.)**

The records herein clearly show that Plaintiff's activities in connection with drug abuse treatment caused him to experience additional stress and fatigue which led to several periods of hospitalization in June and July 1993 for his non-drug-abuse-related blood disease. **(See Exhibit F,**

p. 3 attached to Aff'd. of Def's. Mot. and Exhibit O, pp. 841 - 846 attached to NLG Aff'd. of Def's. Mot.)

The court has held that the concept of injury under FELA is extremely broad and the Act encompasses all reasonably foreseeable injuries resulting from the railroad's failure to exercise due care with respect to its employees. Buell v. Atchison, T. & S.F.R. Co., 71 F.2d 1320, 120 BNA LRRM 2671 (1985); see also, Atchison, Topeka & Sante Fe Ry. Co. v. Buell, 480 U.S. 557 (1987). Hence, where an employee has suffered injury attributable to an employer's negligence, the injury is compensable under FELA regardless of its characterization of the injury as mental or physical. Id. Thus, in the case at bar, whether Defendant characterizes Plaintiff's injuries as mental or physical, his injuries are compensable under FELA. Id.

In addition, as shown from the record and discussed in Point III (B) above, Plaintiff's claims do rise to the requisite level of outrageousness in that (1) Defendant had no evidence on which to support its decision to confine Plaintiff to a psychiatric institution for 30 days, with drug addicts, who threatened him with physical violence; (2) Defendant was adamant that Gracie Square should not release Plaintiff even though Defendant had received reliable information that the results of the re-test Plaintiff's urine sample was negative for use of illegal drugs; (3) during his confinement at Gracie Square, Defendant's agents ignored Plaintiff's life-threatening blood disease causing him to experience unnecessary physical pain and suffering; (4) Defendant refused to release Plaintiff from his coerced confinement for drug rehabilitation so that he could obtain treatment for his life-threatening illness and (5) upon his release from Defendant's in-patient drug program Defendant continued to coerce Plaintiff to participate in drug rehabilitation treatment even though Defendant had been presented with reliable evidence that Plaintiff had not abused illegal drugs. (See Exhibits 10, 11, 14, 15, 16, 19 and 22)

Also, Defendant's EAP employees were aware that within three months of his release from Gracie Square, Plaintiff was repeatedly hospitalized for his non-drug-abuse life threatening illness. **(See Exhibit O, pp. 841 - 846 attached to NLG Aff'd. of Def's. Mot.)** Yet, in his weakened and debilitated physical condition and under the threat of facing disciplinary proceedings and losing his 16-year employment with Defendant, Defendant forced Plaintiff to continue to undergo outpatient drug-abuse treatment even though neither his Gracie Square records nor the re-test of his urine samples revealed any evidence that he had ingested illegal drugs. **(See Exhibits 11, 14, 15 and 19)**

Further, Plaintiff's personal physician, Dr. Needles, had repeatedly brought to the attention of Defendant's EAP employees that the re-test of Plaintiff's urine sample showed that he had not used illegal drugs. **(See Exhibits 10, 11, 14 and 22)** Also, the psychoanalysis evaluation of Plaintiff, requested by Defendant, advised Defendant to investigate the test results of Plaintiff's urine sample, which showed that Plaintiff had abused illegal drugs, so as to determine whether those positive readings could have resulted from error. **(See Exhibit 16 p. 4 para. 3)**

The records presented here show that Defendant's EAP employees ignored both the information it had received from Dr. Needles and the psychoanalysis evaluation of Plaintiff, which Defendant had ordered, and instead continued to deprive Plaintiff of his liberty and to humiliate and harass him by mandating that he undergo drug abuse treatment while he was being repeatedly hospitalized for a life-threatening, non-drug-abuse-related illness which was rapidly and progressively weakening and debilitating him. **(See Exhibit O, pp. 834-847, 892-893)**

The records herein also show that Plaintiff provided Defendant's EAP employees with evidence of his illness and his hospitalizations. **(See Exhibit O, pp. 841 - 846 attached to NLG Aff'd. of Def's. Mot.; and Exhibits 18 and 20)** Defendant's records also demonstrate that Plaintiff discussed with EAP counselors that "his situation was affecting his relationship with his wife." **(See Exhibit O, p. 840, note 8/12/93, to NLG Aff'd. of Def's. Mot.)** Thus, Defendant's EAP counselors

26

were well aware of the physical and mental anguish that Plaintiff was experiencing. Nonetheless, Defendant's EAP counselors chose to engage in conduct which aggravated Plaintiff's mental anguish as well as the physical injuries they had already caused Plaintiff by terminating his enrollment in its EAP for non-compliance with EAP recommended treatment claiming that his inability to attend counseling sessions and AA meetings was because he was non-responsive to the treatment for his alleged drug abuse. **(See Exhibit O, pp. 834, 837 – 839, 892-893 attached to NLG Aff'd. of Def's. Mot.; Exhibit 6, Clark Depo. p. 37 line 11 to p. 38 line 14, and Exhibit 21)** The termination of Plaintiff from Defendant's EAP meant that Defendant would have implemented "immediate disciplinary action" against Plaintiff which would have resulted in the termination of his 16-year employment with Defendant. **(See Exhibit O, p. 889 attached to NLG Aff'd. of Def's. Mot.)**

The facts presented here indicate that Defendant's conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (quoting Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 112 (1993)). Hence, the records herein demonstrate that Plaintiff's claim for Defendant's intentional infliction of emotional distress is proper under FELA.

### POINT VI

### DEFENDANT IS LIABLE TO PLAINTIFF FOR THE INJURIES HE SUSTAINED DUE TO THE NEGLIGENCE OF GRACIE SQUARE HOSPITAL

Defendant argues that it is not liable to Plaintiffs for the negligence of Gracie Square Hospital because Gracie Square is an independent contractor.

The term "agents" as used in FELA, which makes a railroad liable to its employees for damages for injuries resulting from the fault of its agents, is to be given sufficient scope to give vitality to the standard governing liability of carriers to their workers injured on the job. Therefore,

injury caused in whole or in part by the fault of others performing, **under contract** (emphasis added), operational activities for the employer, is caused by "agents" of the employer; hence, an independent corporation which used its own crews and equipment to perform tasks incident to a railroad's business and which furthers the railroad's enterprises is, notwithstanding its corporate autonomy and its freedom from detailed supervision of its operation by the railroad, "agent" of the railroad. Sinkler v. Missouri Pacific R. Co., 356 U.S. 326, 2 L.Ed2 799, 78 S.Ct 758, reh den 356 U.S. 978, 2 L.Ed 2d 1152, 78 S.Ct. 1133.

In addition, the court has found that third parties operating cafeterias, under contract with a railroad for the convenience of the railroad's employees, performed operational activities of the railroad and the negligence of the cafeteria's employee, resulting in injury to the railroad's employee, was imputable to the railroad. Moore v. Chesapeake & O.R. Co., 493 F.Supp. 1252 (1980 SD W VA); see also Brown Admr. v. Norfolk & W.R. Co., (1926, DC Va), 12 F.2d 319, aff'd. (CA4 Va) 20 F.2d 133, cert den 275 U.S. 540, 72 L.Ed. 414, 48 S.Ct. 36; Philadelphia B. & W.R.Co. v. Smith, 250 U.S. 101, 63 L. Ed 869, 39 S.Ct. 396.

In the case at bar, Defendant admits **(Def's. Memo. at 29)** and the record shows that Gracie Square is under a contract with Defendant to perform operational activities on behalf of Defendant in connection with its EAP Department which furthers the business of Defendant's railroad. **(See Exhibit 5, Sturgis Depo. p. 7 line 13 to p. 8 line 5)** The record presented here clearly demonstrates that Plaintiff did not select or request to become a patient at Gracie Square but under the threat of losing his job, Defendant mandated that Plaintiff become a patient at Gracie Square for approximately one month. (See Exhibit O, pp. 846 - 847 attached to NLG Aff'd. of Def's. Mot.; **Exhibit 5, Sturgis Depo. p. 17 line 5 to p. 18 line 17; Exhibit 6, Clark Depo. p. 15 lines 7 – 11, p. 20 lines 6 - 10)** Defendant then directed Gracie Square not to release Plaintiff even though a re-test of the urine sample showed that Defendant's decision to confine Plaintiff to Gracie Square was based

28

on a false positive reading of his urine sample. **(See Exhibits 11, 14 and 22)** As shown by the records Gracie Square could not release Plaintiff because Defendant was adamant that Plaintiff remain as a patient at Gracie Square until it decided when he should be discharged. **(See Exhibit 15, p. 2 para. 3, and Exhibit O, p. 846 attached to NLG Aff'd. of Def's. Mot.)**

Thus, the facts here show that not only is Gracie Square an agent of Defendant, but even if Gracie Square is an independent contractor with corporate autonomy and freedom from detailed supervision of its operations by Defendant, its negligence resulting in injury to Plaintiff is imputable to Defendant. Sinkler v. Missouri Pacific R. Co., supra; Moore v. Chesapeake & O.R. Co., supra; see also Brown' Admr. v. Norfolk & W.R. Co., supra; Philadelphia B. & W.R. Co. v. Smith, supra.

Furthermore, the facts herein show that (1) Gracie Square was acting for Defendant when it agreed to provide treatment to Plaintiff at Defendant's request (2) that Gracie Square had accepted the undertaking to provide treatment to Plaintiff in connection with Defendant's EAP and (3) even though the re-test of Plaintiff's urine sample showed no evidence of illegal drugs Gracie Square could not discharge Plaintiff from its hospital without the consent and direction of Defendant. **(See Exhibit 15 p. 2 para. 3 and Exhibit O p. 846 attached to NLG Aff'd. of Def's. Mot.)** Hence, the records presented here by Defendant established an agency relationship between Gracie Square and Defendant. LaSalle National Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. 1071, 1083 (S.D.N.Y. 1996) (quoting Basic Books, Inc. v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1546 (S.D.N.Y. 1991)); accord, Cabrera v. Jakabovitz, 24 F. 3d 372 (2d Cir.) cert. denied, 513 U.S. 876 (1944); CSC Recovery Corp. v. Daido Steel Co., Ltd. 2000 WL 134578 (S.D.N.Y. 2000) (citation omitted); Cronin v. Hall Street Cold Storage Warehouse, Inc., 1997 WL 720 753, * 8 (E.D.N.Y. 1997).

Moreover, Defendant's control over Gracie Square is not only evident in Gracie Square's inability to discharge Plaintiff without Defendant's consent and direction but, it was Defendant's

employees, not Gracie Square's employees, who ordered psychiatric evaluation of Plaintiff during his confinement in Gracie Square. **(See Exhibit 15, p. 2 para. 3)** In addition, it was Defendant's EAP employees, not Gracie Square employees, who directed Plaintiff to participate in its outpatient drug abuse program after he was released from Gracie Square. Robinson v. Town of Colonie, 878 F.Supp. 387, 407-08 (N.D.N.Y. 1995). See also, **Exhibit 1 p. 3**, Robinson v. Metro-North, Index No. 102456/95, Sup.Ct. (Huff, J.) and **Exhibit 6, Clark Depo. p. 30, lines 8 – 19; Exhibit 5, Sturgis Depo. p. 25 line 24 to p. 26 line 5; see also Exhibit O pp. 846 attached to NLG Aff'd. of Def's. Mot.**

Courts have found that where a railroad has control over various activities of a hospital and its doctors and the railroad derives a benefit from the operation of the hospital by obtaining treatment for its employees, the hospital and its doctor are agents of the railroad. McGuigan v. Southern Pacific Co., 129 Cal.2d 482, 277 P.2d 444 (1954).

Thus, in the instant case, Defendant has failed to set forth any facts or legal theories which even suggest that it is not liable for the injuries Plaintiff sustained while Defendant had him confined in Gracie Square for in-patient drug abuse treatment.

## CONCLUSION

Based upon the foregoing, Defendant's motion to dismiss the instant action for lack of subject matter jurisdiction and/or for summary judgment should be denied in its entirety.

Respectfully Submitted,

By: *[signature]*
Campbell Holder

Campbell Holder & Associates
Attorney for Plaintiffs
401 Broadway, Suite 602
New York, New York 10013
212-966-7313