UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
CHRISTINE ROBINSON,
                                  :
                Plaintiff,            07 Civ. 5992 (DLC)(HBP)
                                  :
    -against-                         REPORT AND
                                  :   RECOMMENDATION
CAMPBELL HOLDER and CAMPBELL
HOLDER & ASSOCIATES,              :

                Defendants.   :

----------------------------------X


        PITMAN, United States Magistrate Judge:


        TO THE HONORABLE DENISE L. COTE, United States District

Judge,


I.  Introduction


        On December 7, 2007, the Honorable Denise L. Cote,

United States District Judge for the Southern District of New

York, concluded that defendants were in default and referred this

matter to me to conduct an inquest and to issue a report and

recommendation concerning plaintiff's damages.

        Pursuant to the Order of Reference, I issued a Schedul-

ing Order on December 21, 2007 directing plaintiff to serve and

file proposed findings of fact and conclusions of law by February

12, 2008 and directing defendants to submit responsive materials

by March 12, 2008.  My December 21, 2007 Scheduling Order further

provided that:

> IF DEFENDANTS (1) FAIL TO RESPOND TO PLAINTIFF'S
> SUBMISSIONS, OR (2) FAIL TO CONTACT MY CHAMBERS BY
> MARCH 12, 2008 AND REQUEST AN IN-COURT HEARING, IT IS
> MY INTENTION TO ISSUE A REPORT AND RECOMMENDATION
> CONCERNING DAMAGES ON THE BASIS OF PLAINTIFF'S WRITTEN
> SUBMISSIONS ALONE WITHOUT AN IN-COURT HEARING. See
> Transatlantic Marine Claims Agency, Inc. v. Ace
> Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997);
> Fustok v. ContiCommodity Services Inc., 873 F.2d 38, 40
> (2d Cir. 1989) ("[I]t [is] not necessary for the Dis-
> trict Court to hold a hearing, as long as it ensured
> that there was a basis for the damages specified in a
> default judgment.")

(Emphasis in original).

The New York Department of Correctional Services's website reflects that defendant Holder is incarcerated at Ogdensburg Correctional Facility, One Correction Way, Ogdensburg, New York 13669. A copy of my December 21, 2007 Scheduling Order was sent to Holder at this address which is the address at which he was served and one of the addresses listed for defendants on the summons and complaint. It has not been returned to my chambers as undeliverable. A copy of the Scheduling Order was also sent to 401 Broadway, Suite 602, New York, New York 10013 but was returned to my chambers as undeliverable presumably because Campbell Holder & Associates no longer exists.

Plaintiff timely submitted proposed findings of fact and conclusions of law supported by evidentiary material. Defendants have not made any written submission to me, nor have defendants contacted my chambers in any way.

2

Accordingly, on the basis of plaintiff's written submissions alone, I respectfully recommend that plaintiff's motion for default judgment (Docket Item 5) be granted and that judgment be entered in plaintiff's favor against defendants in the amount of $250,000.

II.  Findings of Fact

A.  Nature of Action

1.  This is a legal malpractice action[1] (Amended Complaint, dated June 7, 2008 ("Am. Compl.") ¶¶ 1-18[2]).

B.  The Parties

2.  Plaintiff is a citizen of the State of South Carolina and the wife of the deceased, Charles Robinson, who was a citizen and resided in South Carolina at the time of his death.

_____

[1] In the Amended Complaint, plaintiff also asserts claims for breach of contract and loss of consortium.  However, since plaintiff's proposed findings of fact and conclusions of law do not address these latter two claims in any respect, I deem them to be abandoned.

[2] As a result of defendants' default, all the allegations of the Amended Complaint, except as to the amount of damages, must be taken as true.  Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 70 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973); Robinson v. Sanctuary Record Groups, Ltd., 542 F. Supp.2d 284, 289 (S.D.N.Y. 2008); Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose, 282 F. Supp.2d 126, 128 (S.D.N.Y. 2003).

Plaintiff is also administratrix of Charles Robinson's estate (Am. Compl. ¶¶ Ba-Bb).

3.  Defendant, Campbell Holder, is a citizen of the State of New York (Am. Compl. ¶ C).

4.  At all relevant times, Holder was an attorney licensed to practice law in the State of New York, and maintained an office for the practice of law at 401 Broadway, New York, New York, where he did business under the name of Campbell Holder & Associates (Am. Compl. ¶¶ 1-2).

    C.  Facts Underlying
       <u>Plaintiff's Claim</u>

      i.  <u>The Drug Test</u>

5.  Charles Robinson was employed as a conductor by Metro North Commuter Rail Road ("Metro North") (Amended Verified Complaint, dated Aug. 25, 1997 ("Verified Compl.") ¶ 3, annexed as Exhibit 1 to Plaintiff's Proposed Findings of Fact and Conclusions of Law, dated Feb. 12, 2008 ("Plf. Proposed Findings"); Affidavit of Campbell Holder, Esq., dated Aug. 24, 2000 ("Holder Aff.") ¶ 6, annexed as Exhibit 2 to Plf. Proposed Findings).

6.  As part of Metro North's employee assistance program, Charles Robinson participated in an outpatient drug rehabilitation program and submitted urine samples at least twice a week (Holder Aff. ¶ 12).

7.  He was informed by Metro North that the urine sample he provided on February 8, 1993 tested positive for illegal substances (Holder Aff. ¶ 13).

8.  At his request, this urine sample was sent to an independent laboratory for re-testing and arrived at Roche Laboratory on February 26, 1993 (Holder Aff. ¶ 13).

9.  Meanwhile, because of the positive test result, Metro North instructed Charles Robinson that he would have to attend and successfully complete an in-patient drug rehabilitation program at Gracie Square Hospital in order to maintain his employment (Holder Aff. ¶¶ 14-15).

ii.  Gracie Square Hospital and
     Orangeburg Regional Hospital

10.  On March 1, 1993, Charles Robinson admitted himself into Gracie Square Hospital (Holder Aff. ¶ 15).

11.  Four days later, Dr. Carl Needles, Charles Robinson's personal physician, informed Metro North by letter that the re-test of the urine sample proved negative for illegal substances (Holder Aff. ¶ 16).

12.  Since the initial positive results proved to be erroneous, Dr. Needles requested that Charles Robinson be released immediately from Gracie Square Hospital.  Despite receiving the re-testing results and Dr. Needles's letter, Metro North instructed the hospital not to release Charles Robinson until he

completed the entire drug rehabilitation treatment (Holder Aff. ¶ 16).

13.  Consequently, Charles Robinson remained confined at Gracie Square Hospital until his discharge on March 29, 1993 (Holder Aff. ¶ 17).

14.  While at the hospital, Charles Robinson submitted to several blood tests, which revealed that he had an abnormally low blood count (Holder Aff. ¶ 19).

15.  Upon being discharged from Gracie Square Hospital, Charles Robinson was informed by hospital staff for the first time that he had anemia (Letter from New York State Commission on Quality of Care for the Mentally Disabled, dated Sept. 26, 1994 ("NYS Commission Ltr.") at 1, annexed as Exhibit 8 to Plf. Proposed Findings).

16.  On April 4, 1993, while visiting his mother in South Carolina, Charles Robinson collapsed and was hospitalized for eleven days in Orangeburg Regional Hospital, where he received treatment for his anemia (Holder Aff. ¶ 25; NYS Commission Ltr. at 1).

iii.  The State Action
       Against Metro North

17.  Thereafter, Charles Robinson retained Holder to commence an action against Metro North (Am. Compl. ¶ 5).

6

18.   Holder commenced an action on Charles Robinson's behalf in the Supreme Court of New York, County of New York against Metro North pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51, et seq. ("FELA") based on Metro North's negligent supervision of its agent, Gracie Square Hospital (Am. Compl. ¶ 8; Verified Compl. ¶ 1).

19.   On June 2, 2000, Metro North moved for summary judgment dismissing plaintiff's FELA action.  Holder failed to oppose this motion by the stipulated June 26 deadline. (Am. Compl. ¶ 9; Order, dated Oct. 4, 2000 ("10/4/00 Order") at 1, annexed as Exhibit 4 to Plf. Proposed Findings).

20.   On July 6, 2000, Holder belatedly requested that the motion be adjourned to July 20, 2000, and his application was granted.  However, Holder again failed to oppose the motion in a timely manner (Am. Compl. ¶ 10; 10/4/00 Order at 2).

21.   After unsuccessfully attempting to contact Holder, Metro North requested that the court address its motion and a hearing was held on August 14 to discuss the reasons for Holder's delay.  At the hearing, Holder did not deny any of the pertinent facts.  Instead, he explained that he was a solo practitioner and had been too busy to complete his opposition papers in a timely manner.  Although it found Holder's excuse to be inadequate, the court granted Holder the opportunity to submit opposition papers by the following day.  Holder responded that he would need

several additional weeks to submit these papers.  The court
rejected this request, ruled that Holder was precluded from
filing his opposition papers, and granted Metro North's motion on
default, dismissing the complaint (Am. Compl. ¶ 11; 10/4/00 Order
at 2-3; Order, dated Oct. 5, 2000 ("10/5/00") at 2-3, annexed as
Exhibit 6 to Plf. Proposed Findings).

22.  But for Holder's failure to oppose Metro North's
motion, Charles Robinson would have been successful in his FELA
action against Metro North (Am. Compl. ¶ 16).

iv.  Damages

23.  During his confinement at Gracie Square Hospital,
plaintiff was allegedly physically assaulted, threatened, and
mentally abused by the inmates and hospital staff (Plf. Proposed
Findings at 6).

24.  Plaintiff initially seeks $117,000,000, the amount
set forth in the ad damnum clause in the complaint in the under-
lying FELA action (Plf. Proposed Findings at 8-9).

25.  Alternatively, plaintiff seeks $50,000 for each
day of Charles Robinson's confinement (forty days), totaling
$2,000,000, plus punitive damages (Plf. Proposed Findings at 9-
10).

III.  <u>Conclusions of Law</u>

    A.  <u>Jurisdiction and Venue</u>

       26.  For purposes of diversity jurisdiction, "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent[.]"  28 U.S.C. § 1332(c)(2); <u>see</u> <u>also</u> <u>Johnson v. Smithsonian Inst.</u>, 80 F. Supp.2d 197, 199 (S.D.N.Y. 2000) (observing that for purposes of 28 U.S.C. § 1332(c)(2) citizenship of decedent determined "at the time of his death"), <u>aff'd</u>, 4 Fed. Appx. 69 (2d Cir. 2001).

       27.  At the time of Charles Robinson's death, he was a citizen of South Carolina (Am. Compl. ¶ Ba).

       28.  Accordingly, this Court has subject matter juris-diction over this action pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

       29.  Venue in this District is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in this District.

    B.  Holder Committed
       <u>Legal Malpractice</u>

       30.  "A diversity action based on attorney malpractice is a matter of state substantive law."  <u>Barry v. Liddle, O'Conno-</u>

9

r, Finkelstein & Robinson, 98 F.3d 36, 39 (2d Cir. 1996).  Thus,
New York law applies here.

      31.  The elements for a claim of legal malpractice
under New York law are:  (1) an attorney-client relationship at
the time of the alleged malpractice and (2) attorney negligence
(3) that proximately causes (4) actual damages to the client.
Kirk v. Heppt, 532 F. Supp.2d 586, 591 (S.D.N.Y. 2008); see also
Arnav Indus., Inc. Ret. Trust v. Brown, Raysman, Millstein,
Felder & Steiner, LLP, 96 N.Y.2d 300, 303-04, 751 N.E.2d 936,
938, 727 N.Y.S.2d 688, 690 (2001); Parola, Gross & Marino, P.C.
v. Susskind, 43 A.D.3d 1020, 1022, 843 N.Y.S.2d 104, 105-06 (2d
Dep't 2007).

      32.  An attorney is negligent if he or she fails to
exercise that degree of care, skill, and diligence commonly
possessed and exercised by ordinary members of the legal commu-
nity.  Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer, 8
N.Y.3d 438, 442, 867 N.E.2d 385, 387, 835 N.Y.S.2d 534, 536
(2007).  Under this standard, "an attorney may [] be held liable
for . . . 'his neglect to prosecute or defend an action[.]'"
Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d
Cir. 2006), quoting Bernstein v. Oppenheim & Co., 160 A.D.2d 428,
430, 554 N.Y.S.2d 487, 489-90 (1st Dep't 1990).

      33.  Where, as here, a client seeks damages for the
value of a lost claim, the client must prove the element of

proximate cause by "demonstrat[ing] that 'but for' the attorney's conduct the client would have prevailed in the underlying matter[.]" Kirk v. Heppt, supra, 532 F. Supp.2d at 592 (internal quotation marks omitted); see also McKenna v. Forsyth & Forsyth, 280 A.D.2d 79, 82, 720 N.Y.S.2d 654, 656 (4th Dep't 2001) ("The requirement of proving a case within a case . . . adds an additional layer to the element of proximate cause[.]") (internal quotation marks omitted).

34.  Here, it is clear that there was an attorney-client relationship between Charles Robinson and Holder during the time Holder failed to oppose Metro North's motion for summary judgment (Am. Compl. ¶¶ 5-6; 10/5/00 Order at 3).

35.  It is equally clear that Holder breached the duty of care he owed to his client by inexcusably failing to oppose Metro North's summary judgment motion, which resulted in the court granting the motion on default and dismissing Charles Robinson's FELA complaint (Am. Compl. ¶¶ 9-14; 10/4/00 Order at 1-3; 10/5/00 Order at 1-5).  Holder twice failed to respond to Metro North's dispositive motion in a timely manner.  During this time, Holder never requested an adjournment of the due dates for his response or informed opposing counsel or the court of the reasons for his delay.  Moreover, at the hearing held to address his conduct, Holder requested several additional weeks to com-

plete his opposition papers despite the fact that Holder's papers were already two months overdue.

36.   The element of proximate cause is also satisfied since the state court granted Metro North's summary judgment motion on default, solely based on Holder's failure to oppose that motion.  Thus, but for Holder's negligence, Charles Robinson would have prevailed on his meritorious FELA claim (Compl. ¶¶ 4, 16-17).

37.   Lastly, the loss of Charles Robinson's ability to pursue the FELA claim to settlement or to a jury verdict consti-tutes actual damages caused by Holder's negligence alone.  See Baker v. Dorfman, 97 Civ. 7512 (DLC), 1998 WL 642762 at *6 (S.D.N.Y. Sept. 17, 1998).

C.   Damages for Holder's
     Legal Malpractice

38.   In a legal malpractice case, where, as here, a client asserts that his or her attorney's negligence resulted in the loss of a claim, the measure of damages is "the value of the claim lost" Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 42, 555 N.E.2d 611, 613, 556 N.Y.S.2d 239, 241 (1990); see also Lindenman v. Kreitzer, 7 A.D.3d 30, 34-35, 775 N.Y.S.2d 4, 8 (1st Dep't 2004).

39.   Thus, the appropriate amount of damages in this case is an amount representing the value of the lost FELA claim.

40.  Plaintiff offers two alternative measures of damages, initially contending that an appropriate amount is $117,000,000, the amount set forth in the ad damnum clause in the complaint in the underlying FELA action (Plf. Proposed Findings at 8-9).

41.  An award of damages in this amount is precluded by Rule 54(c) of the Federal Rules of Civil Procedure because it is greater than the $2,000,000 prayed for in the Amended Complaint. Fed.R.Civ.P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."). An award of $117,000,000 would also be based on pure speculation. Kirk v. Heppt, supra, 532 F. Supp.2d at 592 (damages in legal malpractice action cannot be "speculative"); see also Credit Lyonnais Sec. (USA), Inc. v. Alcantara, supra, 183 F.3d at 155 (damages awarded as result of default judgment must be ascertained with "reasonable certainty").

42.  In the alternative, plaintiff proposes an award of $50,000 for each day Charles Robinson spent in Gracie Square Hospital (twenty-nine days) and Orangeburg Regional Hospital (eleven days), totaling $2,000,000, plus punitive damages (Plf. Proposed Findings at 9-10).

43.  This amount of damages is not warranted either. First, notwithstanding plaintiff's allegations that Charles Robinson was physically injured and mentally abused by other

13

residents and the staff at Gracie Square Hospital (Plf. Proposed
Findings at 6), she has not offered a scintilla of evidence to
substantiate these assertions.  Even where a defendant defaults,
a plaintiff must prove her damages.  <u>Robinson v. Sanctuary Record
Groups, Ltd.</u>, <u>supra</u>, 542 F. Supp.2d at 288 ("[A] plaintiff is
required to prove damages [for the purposes of an inquest] . . .
using competent evidence[.]").  Furthermore, the medical records
from Orangeburg Regional Hospital do not reveal that Charles
Robinson had suffered any recent physical and mental trauma.
Second, plaintiff cannot recover for alleged injuries that
purportedly flow from the eleven days Charles Robinson spent in
Orangeburg Regional Hospital because plaintiff did not allege
such injuries in the Amended Complaint.  In addition, even if I
assume that plaintiff made such an allegation, plaintiff has not
sustained her burden of proving with reasonable certainty by way
of expert testimony or other evidence any damages that arose from
Charles Robinson's hospitalization in South Carolina.  <u>See
Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, <u>supra</u>, 973
F.2d at 160 (plaintiff bears burden of proving damages at in-
quest).

        44.  The only injury to Charles Robinson that is
compensable is the value of his loss of liberty for the twenty-
five days he unnecessarily spent in Gracie Square Hospital after
Metro North received actual notice that the positive results of

his drug test were erroneous.  Plaintiff fails to cite and my
research fails to reveal any case in which a plaintiff was
awarded compensatory damages for his unwarranted detention in an
in-patient drug rehabilitation facility.  False imprisonment
cases serve as helpful analogies.  See, e.g., Gardner v. Feder-
ated Dep't Stores, Inc., 907 F.2d 1348, 1352-53 (2d Cir. 1990)
(ordering remittitur of a $150,000 jury award to $50,000 where
plaintiff wrongfully detained for two hours in a store detec-
tive's cell and six hours in a jail cell); Landow v. Town of
Amherst, 49 A.D.3d 1236, 1237, 853 N.Y.S.2d 760, 761 (4th Dep't
2008) (award of $10,000 not excessive where plaintiff incarcer-
ated for four hours); Hallenbeck v. City of Albany, 99 A.D.2d
639, 639-40, 472 N.Y.S.2d 187, 188-89 (3d Dep't 1984) (ordering
remittitur of a $25,000 jury award to $10,000 where plaintiff
detained three hours and suffered no substantial physical or
mental injuries); Kelly v. Kane, 98 A.D.2d 861, 862, 470 N.Y.S.2d
816, 818 (3d Dep't 1983) (affirming award of $5,000 where plain-
tiff in police custody approximately one hour and fifteen min-
utes); Woodard v. City of Albany, 81 A.D.2d 947, 947, 439
N.Y.S.2d 701, 702 (3d Dep't 1981) (ordering remittitur of a
$16,000 jury award to $7,500 where the plaintiff spent five hours
in jail).  After adjusting for inflation,[3] the average award is

_____

[3]See U.S. Dep't of Labor, Bureau of Labor Statistics,
http://www.bls.gov/CPI/ (last visited July 2, 2008) (click on
                                              (continued...)

$6,416 per hour of detention.  These cases, which involve a plaintiff's detention between an unlawful arrest and arraignment, are not perfect analogies because a jail cell arguably involves a more severe denial of free movement than an in-patient drug treatment facility.  Moreover, many of these cases fail to delineate what amount of damages is directly traceable to the plaintiff's loss of liberty only rather than the loss of liberty plus any attendant harm to reputation and physical and emotional injuries.

     45.  Cases involving involuntary civil commitment in hospitals serve as more useful analogies.  See, e.g., Ruhlmann v. Smith, 323 F. Supp.2d 356, 367-68 (N.D.N.Y. 2004) (ordering remittitur of a $1,000,000 jury award to $450,000 where plaintiff confined for four days in mental health unit of hospital; record contained evidence of plaintiff's mental injuries); Marion v. LaFarque, 00 Civ. 0840 (DFE), 2004 WL 330239 at *8-*12 (S.D.N.Y. Feb. 23, 2004) (ordering remittitur of a $750,000 jury award to $150,000 where plaintiff involuntarily committed for six days in psychiatric hospital; plaintiff testified as to physical and mental injuries), aff'd, 186 Fed. Appx. 96 (2006).  Adjusting for inflation, the average award reflected in these cases is $78,842 per day of confinement.  These cases are not perfectly on point

--------

     [3](...continued)
"inflation calculator").

either because the record here does not establish that Charles
Robinson's initial admission to Gracie Square Hospital was not
entirely involuntary.  I also emphasize that the record here is
devoid of any evidence establishing that Charles Robinson
suffered any physical or emotional injuries as a result of his
detention.  In the cases above, many of the plaintiffs presented
such evidence and were awarded compensatory damages for such
injuries.

46.  I am aware that Charles Robinson's death before
the commencement of this action and Holder's negligence in the
underlying FELA action likely contributed to the lack of evidence
concerning damage to his reputation and physical and mental
injuries, if any.  These circumstances, however, do not relieve
plaintiff of her burden of proving damages.  Nevertheless, "[t]he
damages recoverable for loss of liberty for the period spent in a
wrongful confinement are separable from damages recoverable for
such injuries as physical harm, embarrassment, or emotional
suffering."  Kerman v. City of New York, 374 F.3d 93, 125 (2d
Cir. 2004); accord Gardner v. Federated Dep't Stores, Inc.,
supra, 907 F.2d at 1353.  Indeed, at least in the false
imprisonment context, the Court of Appeals has noted that "an
award of several thousand dollars may be appropriate simply for
several hours' loss of liberty."  Kerman v. City of New York,
supra, 374 F.3d at 126 (citing New York cases).  Accordingly, in

17

light of the totality of the circumstances disclosed by the record, analogous case law, and the difficulty of quantifying damages for the deprivation of human liberty, I conclude that a reasonable amount of compensatory damages is $10,000 per day for twenty-five days, totaling $250,000.

       47.  Lastly, I find that an award of punitive damages is not appropriate.  Under New York law, punitive damages are available in legal malpractice actions where "an attorney abuse[-s] his professional status and breache[s] his duty of trust and confidence by making repeated misrepresentations to his client[.]"  Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363 (2d Cir. 1988), citing Green v. Leibowitz, 118 A.D.2d 756, 758, 500 N.Y.S.2d 146, 149 (2d Dep't 1986).  Plaintiff asserts that Holder "failed to inform [her] of the fact that the [FELA] action had been dismissed" and "lied outright to [her] for several years regarding the active status of that lawsuit" (Plf. Proposed Findings at 4).  However, plaintiff does not cite any evidence to substantiate these allegations and the record before me is wholly devoid of any evidence that establishes that Holder misrepresented the status of the FELA action to her.  Nor does the evidence as to Holder's inexcusable failure to oppose Metro North's motion provide a basis for the imposition of punitive damages.  While Holder's conduct certainly amounted to negligence, it was not "so outrageous as to evince a high degree

18

of moral turpitude and showing such wanton dishonesty as to imply a criminal indifference to civil obligations[.]" Walker v. Stroh, 192 A.D.2d 775, 776, 596 N.Y.S.2d 213, 214 (3d Dep't 1993) (internal quotation marks omitted); see also Cappetta v. Lippman, 913 F. Supp. 302, 307 & n.6 (S.D.N.Y. 1996) (plaintiff not entitled to punitive damages on legal malpractice claim, even though attorney inadequately pursued client's underlying claim, because attorney "did not act in a criminally indifferent manner"). Lastly, the record does not disclose any link whatsoever between the crimes for which Holder is currently imprisoned, which, according to plaintiff, arose from Holder's unlawful conversion of client money held in escrow (Plf. Proposed Findings at 1), and Holder's prosecution (or lack thereof) of the underlying FELA action.

IV. Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that a default judgment be entered in plaintiff's favor in the total amount of $250,000.

V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to

file written objections.  See also Fed.R.Civ.P. 6(a) and 6(d).

Such objections (and responses thereto) shall be filed with the

Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Denise L. Cote, United States District

Judge, Room 1040, 500 Pearl Street, New York, New York 10007 and

to the chambers of the undersigned, Room 750, 500 Pearl Street,

New York, New York 10007.  Any requests for an extension of time

for filing objections must be directed to Judge Cote.  FAILURE TO

OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS

AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140

(1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.

1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054

(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir.

1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237 & n.2 (2d Cir.

1983).

Dated:    New York, New York
          July 2, 2008

                                    Respectfully submitted,

                                    _____
                                    HENRY PITMAN
                                    United States Magistrate Judge

Copy transmitted to:

Philip J. Dinhofer, Esq.
77 N. Centre Avenue
Suite 311
Rockville Centre, New York   11570

Copy mailed to:

Campbell Holder
07-R-0219
Campbell Holder & Associates
c/o Ogdensburg Correctional Facility
One Correction Way
Ogdensburg, New York   13669-2288